Electronically Filed
Supreme Court
SCWC-12-0001114
04-MAY-2016
08:46 AM

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

STATE OF HAWAI'I,
Respondent/Plaintiff-Appellee,

vs.

LAST KONY,
Petitioner/Defendant-Appellant.

SCWC-12-0001114

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-12-0001114; CR. NO. 11-1-1294)

MAY 4, 2016

McKENNA, POLLACK, AND WILSON, JJ.,
AND RECKTENWALD, C.J., CONCURRING, WITH WHOM NAKAYAMA, J., JOINS

OPINION OF THE COURT BY POLLACK, J.

This case involves the admissibility of expert

testimony in child sexual abuse cases.  Last Kony challenges his

convictions of sexual assault of a minor on the grounds that

expert testimony regarding child sexual abuse is no longer

relevant, the statistical data presented during his trial was

misleading and highly prejudicial, and the evidence presented during his trial improperly profiled him as a sex offender. We affirm the trial court's ruling as to the relevancy of the expert testimony in this case regarding the unique characteristics of child sexual abuse victims admitted to assist the jury "to comprehend something not commonly known or understood"--delayed reporting. State v. Batangan, 71 Haw. 552, 557-58, 799 P.2d 48, 52-54 (1990). Additionally, although we conclude that Kony did not properly preserve for appeal his argument that the expert testimony presented in this case was unfairly prejudicial or misleading, we provide guidance in light of the Intermediate Court of Appeals' analysis of this issue.

## I. Background

Kony was charged in the Circuit Court of the First Circuit (circuit court) with sexual assault of a minor. The charges consisted of three counts of sexual assault in the first degree and six counts of sexual assault in the third degree.[1]

---

[1] Sexual assault in the first degree is a violation of HRS § 707-730(1)(c) (2008), which states:

> (1) A person commits the offense of sexual assault in the first degree if:
>
> . . . .
>
> > (c) The person knowingly engages in sexual penetration with a person who is at least fourteen years old but less than sixteen years old; provided that:

(continued . . .)

The complaining witness (Minor) lived in the same household with Kony, along with six family members and one other person. Kony was the boyfriend of Minor's half-sister and father to two children in the home.[2] Minor was fifteen years of age at the time of the alleged sexual assaults.

### A. Pre-trial motion to exclude expert testimony

Prior to the start of trial, Kony filed a motion in limine to exclude the expert testimony of Dr. Alexander Jay Bivens. Kony asserted that Dr. Bivens' testimony would be irrelevant and that its probative value would be substantially

---

(continued . . .)

> (i)   The person is not less than five years older than the minor; and
>
> (ii)  The person is not legally married to the minor . . . .

Sexual assault in the third degree is a violation of HRS § 707-732(1)(c) (2009), which provides:

> (1)   A person commits the offense of sexual assault in the third degree if:
>
> . . . .
>
>   (c)       The person knowingly engages in sexual contact with a person who is at least fourteen years old but less than sixteen years old; provided that:
>
>     (i)   The person is not less than five years older than the minor; and
>
>     (ii)  The person is not legally married to the minor . . . .

[2]   Minor explained that the family considered Kony and her half-sister married, although the two were not legally married.

outweighed by the danger of unfair prejudice, specifically Kony's propensity to commit the crime for which he was charged.

At the hearing on the motion in limine,[3] the State explained that the reporting of the abuse in this case was delayed and that Dr. Bivens would provide expert testimony on why delayed reporting commonly occurs in sexual abuse cases. The State expressed that its questioning of Dr. Bivens would be limited to what factors could hypothetically lead to delayed reporting. The defense expressed a concern that Dr. Bivens would testify about inaccuracies of a witness' testimony; the Court responded that such testimony would not be allowed:

> THE COURT: . . . I'm not going to let the State get into that. I mean, he won't have heard the testimony. So, you know, what's his testimony on that going to be? Hypothetically I've had cases before where they, you know, they testified this way. I mean, I'm going to have to go question by question on that one. I take this motion to be though basically to preclude him from taking the stand, preclude the State from putting him on.
>
> [Defense Counsel]: That's correct, your honor. Just, you know, basically he's, you know, from my view, not related to this case and therefore irrevelant [sic].

The circuit court ruled that it would allow Dr. Bivens to testify, but the court reiterated that if defense counsel thought any of the State's questions were objectionable,

---

[3] The Honorable Glenn J. Kim presided over the motion and trial proceedings in this case.

the court would rule "question by question" on any objections.

> I'm going to allow the State to call him on this issue of delayed reporting. And obviously they're going to have to qualify him as an expert and then -- but that's the offer of proof and that's as far as I'm concerned what I'm going to allow as far as the testimony, and aside from that, we're just going to go question by question. [Prosecutor] will ask the question. If you think it's objectionable, you go ahead and object, [Defense Counsel], and I'll rule question by question basically.

## B. Testimony adduced by State

At trial, Minor testified that from May to August 2011, Kony sexually assaulted her three times in her room at the shared home. The first incident occurred on the morning of her fifteenth birthday on May 6, 2011, just after midnight. Minor testified that she was asleep in her bedroom with her door locked but the lock could be picked with a fingernail. Minor knew it was Kony because he told her "Don't worry, be quiet, it was just him," and she also recognized his figure and voice. Minor testified that the second incident occurred approximately two weeks later. Kony came in her bedroom, and he told her that it was him again. During the second incident, Kony told her that there would be problems if her family found out about his "coming in her room." The last incident occurred a few days before Minor reported the events to her mother on August 12, 2011.

Minor indicated that Kony was not in her room for more than five minutes during any of the incidents. Minor testified that she did not scream during the incidents because she "was shocked it happened," but she told Kony to "get out." She also testified that she was worried about her "family being messed up," she felt bad for her sister, and she was scared.

Minor testified that the first person she told about the incidents was her cousin who she told "[w]hile it was happening." Cousin explained that she and Minor were "very close" and that Minor "didn't know what to do and what to say to her family because [Minor] said that's her sister's boyfriend." Cousin testified that Minor told her the rape happened a single time and that Kony "tried to do other things like touch her" several other times.

Minor explained that she did not tell her parents or other family members because she was not "close" to any of them. Minor testified that she did not tell her mother until an argument occurred between them. At that time, Minor's mother was accusing her of being "bad" and asked her why she could not be more like her sisters, at which point Minor told her mother about the incidents.

Minor's mother testified that she confronted Kony, who stated that he was "sorry and he didn't know what

got into him that made him do that." Kony did not state what he did, but he did tell the mother that he went inside Minor's room and "he was sorry he did it."

After the confrontation, Kony moved out of the home. Weeks later, Minor's father was informed, and he reported Minor's allegations to the police. Father also confronted Kony, and Father testified that during the confrontation, Kony apologized for being inside Minor's room.

### C. Dr. Bivens' testimony

Dr. Bivens was qualified, without objection, as an expert for the State in clinical psychology with an emphasis on the dynamics of child sexual abuse. Dr. Bivens testified that he did not have any information about the case. Dr. Bivens explained that he understood he was testifying in order to provide information to the jury about the nature of child sexual abuse to assist the jury in making their own determination about the facts of the case.

The State asked Dr. Bivens where child sexual abuse usually occurs. Dr. Bivens answered in terms of whether the offender was an "incest offender" or an offender outside the family:

> [Dr. Bivens:] [T]here have been a couple of -- a couple of significant studies. And when I say "significant," I mean to say these are studies that are regarded as being done very well on this topic. And what I found was that a hundred percent of incest offenders, offenders offending

against family members, committed their -- committed offenses in their own home. And what that means is that a hundred percent of incest victims experience sexual abuse within their own home.

When it's outside the family, about 50 percent of -- about 50 percent, a little over 50 percent, 54 percent of offenses occur in the molester's home, and, um, a little less than 50 percent, 46 percent say, occur in the child's home. So as strangers that may seem to the layperson a lot of times it's happening either in the child's home or in the molester's home.

[Prosecutor:] Well, a lot of times? It sounds like a hundred percent of the time it's in one of those two places.

[Dr. Bivens:] Well, it sounds that way. Now I don't mean to be misleading. It can also happen in a car or in some other isolated place. But what we are talking about is that, um -- is that incest molesters virtually always seem to commit some molestation in their own home, and they always seem -- and so in other words -- how can I put this -- it could happen elsewhere also, but in their own home seems to come up virtually every time we look at it for the victims and for the molesters as described.

Dr. Bivens explained how percentages "work" and their relative reliability:

Well, there are error rates associated with percentages always. And there are ways that researchers look at this. Um, there are these statistics called "standard deviations" and things like that. The studies that I'll be talking about today have enough individuals included in the study so that the percentages are relatively reliable. Percentages should only be used to be given a general idea of, you know, how the phenomenon most often occurs. Something like that.

Dr. Bivens then provided percentages as to the nature of preexisting relationships between a sexually abused child and their abuser, including percentages of cases in Hawai'i where the offender had a family relationship with the victim:

Right. Well, eighty -- consistently across numerous studies -- I don't even know how many studies -- 85 percent of sexual abuse victims have a pre-existing non-sexual

> relationship with their molester. Um, this doesn't have to be a family relationship.
>
> In Hawaii the cases that we get reported to us we're looking at about 50 per -- a little over 50 percent do have a family relationship. Um, and if it's not a family relationship, um, it -- it is a pre-existing relationship of some kind between the child and the molester.
>
> And beyond that a recent study showed that about 70 percent of molesters had a relationship with the child's parents, so you get a sense of the significance that the person -- the significant role that the individual plays in the child's life prior to any molestation happening.

Dr. Bivens also explained that the relationship is considered incest as long as the offender is a family member living in the child's home. The State inquired about the gender of abusers, and Dr. Bivens gave the following answer:

> Unfortunately over 95 percent of sexual crimes are committed by males. And let me just be more specific. Sex crimes against children are committed by males. It's a pretty rare phenomenon for females to do it. And when they do it, their victims are usually older. So if you're talking about younger victims, it's even higher than 95 percent. It just seems to be a male problem. Perpetrators are typically male.

Dr. Bivens then discussed reporting of the sexual abuse, opining that "delayed disclosure is the rule, not the exception." He explained that large scale studies have found that two thirds of adults who say that they were sexually molested as children never told anyone before the age of eighteen. Dr. Bivens identified mothers and close friends as the persons sexually abused children most often tell and provided percentages to substantiate this assertion:

> [T]he most typical person that a child will tell is their mother. Okay. The next most common -- so about 33 percent of children who tell will tell their mother. About a same

number of children, 32 percent or so, will tell a close friend and usually in their teenage years when they start feeling like they have more of a voice. So as their age increases, their likelihood of telling increases because they feel like they're able to talk better, they're able to make their points a little more forcefully.

The State next asked whether the scientific literature that Dr. Bivens had been discussing offered any insights into what causes delayed reporting. The defense objected to Dr. Bivens' response to this question on relevancy grounds, apparently because the answer related to children less than ten years old. Dr. Bivens was allowed to complete his answer to the question, but the court instructed defense counsel to "[k]eep objecting as to questions that come if you feel it's appropriate." Dr. Bivens continued his answer, referring to a study involving two groups of children--five-year-olds and seven-year-olds. Defense counsel again objected on relevancy grounds, and the court stated that if Dr. Bivens continued to discuss five to seven year-olds, it would "start sustaining objections." The prosecutor then sought permission from the court to lead the witness toward certain age groups" to save time. The court declined to grant pre-permission for any particular question, again stating that if defense counsel objected, the court would rule.

Dr. Bivens explained that older children, particularly teenage girls, appeared more reluctant to reveal information

about sexual assaults.  He then provided exact percentages as to the reasons given by women who reported being sexually abused as children for their delay in reporting:

> [A]bout 29 percent said they expected not to be believed.  About 25 percent said they were embarrassed.  A similar number, 24 percent, said they didn't want to upset anyone or cause chaos in their family.
>
> Eighteen percent said they didn't want to harm the abuser because they had a relationship with the abuser and they didn't want to get the abuser in trouble.  So that gives you kind of an interesting picture of what can go on for sexually abused females.

Dr. Bivens next discussed the dynamics of child sex abuse and how it relates to delayed reporting.  The State asked whether multiple incidents of abuse over time affects delayed reporting.  Dr. Bivens responded that multiple incidents of abuse "implies delayed reporting."  Dr. Bivens explained that children feel guilty for not reporting earlier and worry that they are going to be blamed for not reporting.

Dr. Bivens also identified the type of circumstances where victims of abuse will finally report the molestation by the offender.  He explained that "some of the classic ones are like an anger-inducing incident where the child is being held accountable for being negative or bad or hypocritical."  Dr. Bivens described how the victim might feel they have nothing to lose by telling the truth:

> There's something that's got them so upset that maybe they're already in so much trouble, they don't feel like they have anything else to lose by telling the truth, um, and so they're not so afraid of the consequences.  Um,

> sometimes the proximity of the offender. If the offender has left but then is now coming back or if the child -- yeah, so if the offender is then out of the house and is then coming back, the child may disclose to tell in order to protect themselves.

The court, sua sponte, intervened striking from the record what Dr. Bivens said about the child telling the truth and instructed the jury to disregard it.[4]

### D. Testimony adduced by Kony

Kony's girlfriend, Minor's half-sister, testified that she and Kony lived with Kony's sister at a separate home, they never lived at Minor's home, and Kony never stayed the night at Minor's home. Kony's girlfriend also testified that Kony never apologized to Minor's parents for anything he did to Minor, and she denied that Kony was confronted by Minor's parents.

A co-worker of Kony testified that Kony worked a 1:00 AM to 8:00 AM shift at a cleaning company from May 31, 2011, to September, 2011. The co-worker testified that Kony arrived to work on the Honolulu city bus. Kony stipulated to the entry of his record cards into evidence, showing the hours and days he was working. Kony's record cards indicate that Kony was not

---

[4] Dr. Bivens also described how sexual abuse affects memory. He discussed the effects of trauma on a victim's memory citing a study involving children in car accidents. Defense counsel objected to this testimony as irrelevant, and the court sustained the objection.

scheduled for work on nine days in June, seven days in July, and nine days in August, 2011. Kony did not testify.

Kony was found guilty and sentenced to terms of incarceration of twenty years for three counts of sexual assault in the first degree and five years for three counts of sexual assault in the third degree, with the terms to run concurrently.[5] Kony filed an appeal to the Intermediate Court of Appeals (ICA) from the November 28, 2012 Judgment of Conviction and Sentence.

### E. ICA Proceedings

Kony's opening brief, raised a single point of error-- that the circuit court erred in allowing Dr. Bivens' testimony. Kony argued that Dr. Bivens' testimony was not of assistance to the jury because the commonness of delayed disclosure of child victims no longer constituted specialized knowledge outside the common experience of the jury. Kony also asserted that Dr. Bivens' testimony relied on statistics in a manner that was misleading and highly prejudicial. Kony further contended that the statistical and profile evidence cited by Dr. Bivens vouched for Minor's credibility.

In its answering brief, the State argued that Dr. Bivens' testimony was relevant to assist the jury in

---

[5] At the close of the prosecution's case, the trial court granted Kony's motion for judgment of acquittal as to Counts 2, 5, and 8.

understanding behaviors and phenomena associated with sexual abuse.  The State contended Kony was not prejudiced by Dr. Bivens' testimony and maintained that Kony did not object to the testimony on the grounds that it was profile evidence or that the doctor's use of statistics was highly prejudicial.  The State asserted that it did not misinterpret any statistics mentioned by Dr. Bivens or improperly suggest during closing argument that Kony was guilty because he matched a profile of individuals who sexually assault children.

In reply to the State, Kony argued that he did not waive his challenge to Dr. Bivens' testimony.  Kony contended that he argued in his motion in limine that Dr. Bivens' testimony was not relevant and that its minimal probative value was outweighed by its prejudicial effect.  Kony maintained that he was not required to continuously object throughout the trial after the court had definitively ruled to allow Dr. Bivens' testimony because the court's invitation for the defense to object was only if defense counsel believed that the State was exceeding the scope of the court's ruling.

The ICA issued a Summary Disposition Order (SDO) affirming the circuit court's judgment of conviction.  The ICA rejected Kony's argument that expert testimony regarding delayed reporting is no longer helpful to juries.  The ICA also assumed

that Kony preserved his objections to Dr. Bivens' testimony for improper bolstering of the complaining witnesses' credibility and profiling of Kony as a sex offender and held that those arguments were meritless.  The ICA noted that Dr. Bivens testified that error rates are always associated with percentages and that Kony acknowledged that Dr. Bivens did not have any information about the case.

Judge Reifurth concurred in the result, but he wrote separately to clarify his understanding of the Hawai'i Rules of Evidence (HRE) Rule 403 analysis that would apply--had Kony properly raised his objections that elements of Dr. Bivens' testimony were misleading and unduly prejudicial.  Judge Reifurth explained that the potential prejudice of the evidence should be assessed against its probative value under HRE Rule 403.  Judge Reifurth stated that he would have resolved the issue of prejudice, arising from expert testimony regarding the typical characteristics and behaviors of child sexual abusers, as waived because Kony failed to object at trial to any testimony of Dr. Bivens as prejudicial.

## II. Standards of Review

We apply the right/wrong standard in reviewing challenges to a court's relevancy decision under HRE Rules 703, 401, and 402.  State v. Vliet, 95 Hawai'i 94, 107, 19 P.3d 42, 55

(2001). "Evidentiary decisions based on HRE Rule 403, which require a 'judgment call' on the part of the trial court, are reviewed for an abuse of discretion." State v. Richie, 88 Hawai'i 19, 37, 960 P.2d 1227, 1245 (1998) (footnote omitted) (quoting State v. Arceo, 84 Hawai'i 1, 11, 928 P.2d 843, 853 (1996)). "An abuse of discretion occurs when the decisionmaker 'exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party.'" Vliet, 95 Hawai'i at 107, 19 P.3d at 55 (quoting In re Water Use Permit Applications, 94 Hawai'i 97, 183, 9 P.3d 409, 495 (2000)).

### III. Discussion

Kony contends that the ICA gravely erred in holding that the circuit court did not err in allowing the testimony of Dr. Bivens as an expert in clinical psychology and the dynamics of child sexual abuse and permitting testimony on the issue of delayed reporting. Kony maintains that the testimony "was not relevant, not proper expert testimony, improperly profiled [Kony] as a sex offender and relied on statistical data that was misleading and highly prejudicial."

### A. Kony's Relevancy Objection to Dr. Bivens' Testimony

The admission of expert testimony is initially governed by HRE Rule 702.[6]  Under HRE Rule 702, an expert witness may testify in the form of an opinion or otherwise if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue."  HRE Rule 702 (1993).  One of the "touchstones of admissibility for expert testimony under HRE Rule 702" is relevance.[7]  Vliet, 95 Hawai'i at 106, 19 P.3d at 54; see also State v. Batangan, 71 Haw. 552, 562, 799 P.2d 48, 54 (1990).  "In determining the relevancy issue, the trial courts' function is akin to the relevancy analysis adopted in applying HRE Rules 401 and 402."[8]  Vliet, 95 Hawai'i at 106, 19

---

[6]       HRE Rule 702 provides the following:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.  In determining the issue of assistance to the trier of fact, the court may consider the trustworthiness and validity of the scientific technique or mode of analysis employed by the proffered expert.

HRE Rule 702 (1993).

[7]       Another touchstone of admissibility under HRE Rule 702 is reliability.  Vliet, 95 Hawai'i at 106, 19 P.3d at 54.  We do not consider the reliability of the evidence as Kony only objects to the testimony as not relevant.

[8]       Under HRE Rule 401, "relevant evidence" "means evidence having any tendency to make the existence of any fact that is of consequence to the
(continued . . .)

P.3d at 54 (footnotes omitted).  "The critical inquiry with respect to expert testimony is whether such testimony will assist the trier of fact to understand the evidence or determine a fact in issue."  State v. Fukusaku, 85 Hawai'i 462, 472, 946 P.2d 32, 42 (1997) (quoting State v. Maelega, 80 Hawai'i 172, 181, 907 P.2d 758, 767 (1995)).  In State v. Batangan, 71 Haw. 552, 799 P.2d 48 (1990), this court considered the admissibility of expert testimony under HRE Rule 702 regarding the patterns of behavior of child victims of sexual abuse.  71 Haw. at 555, 799 P.2d at 50.  The court in Batangan found that sexual abuse of children "is a particularly mysterious phenomenon," Id. at 557, 799 P.2d at 51 (quoting State v. Castro, 69 Haw. 633, 648, 756 P.2d 1033, 1044 (1988)).  The court also observed that the jury may lack an adequate foundation "for assessing the credibility of a young child who complains of sexual abuse" because "[n]ormally," seemingly bizarre behavior such as delayed reporting might "be attributed to inaccuracy or prevarication." Id. (quoting State v. Myers, 359 N.W.2d 604, 610 (Minn. 1984)). Expert testimony, therefore, explains to the jurors "the unique interpersonal dynamics involved in prosecutions for intrafamily

_____

(continued . . .)
determination of the action more probable or less probable than it would be without the evidence."  HRE Rule 401 (1993).

child sexual abuse" and corrects "widely held misconceptions," in order that the jury "may evaluate the evidence free of the constraints of popular myths." Id. at 557-58, 799 P.2d at 52 (first quoting Wheat v. State, 527 A.2d 269, 275 (Del. Super. Ct. 1987); then quoting People v. Gray, 231 Cal. Rptr. 658, 660–661 (Cal. Ct. App. 1986)).

The Batangan court found that expert testimony was necessary to address "patterns of behavior" of minor victims of sexual assault "which are seemingly inconsistent with behavioral norms of other victims of assault," including delayed reporting. Id. at 557, 799 P.2d at 5. The court noted that "it is helpful for the jury to know that many child victims of sexual abuse behave in the same manner." Id. at 557, 799 P.2d at 52. While Batangan stands for the proposition that such testimony is helpful to the jury in cases involving "'seemingly bizarre' behavior of child sex abuse victims," id. at 558, 799 P.2d at 52, such testimony is not indiscriminately admissible under Batangan and instead must be evaluated under the requirements of HRE Rules 702, 401, 403, and other rules of evidence.

In this case, Dr. Bivens discussed delayed reporting by children identified as victims of sexual abuse. Kony argued on appeal that expert opinion is no longer needed to explicate the phenomenon of delayed reporting. However, under Batangan

expert testimony regarding "seemingly bizarre" behavior of victims, including the phenomenon of delayed reporting, has been held to be helpful to the jury where reporting by a child victim of sexual abuse is delayed.  At the motion in limine hearing, Kony's position was that Dr. Bivens' testimony was not related to this case and therefore irrelevant.  The testimony from Minor indicates that her reporting of the abuse, which first occurred in May 2011, was delayed until August 2011.  Consequently, the record in this case supports a determination by the trial court that it would be helpful for the jury to hear expert testimony that delayed reporting is a common phenomenon in incidents of child sexual abuse.  Thus, the circuit court did not err in determining that Dr. Bivens' testimony regarding delayed reporting was relevant and admissible.

B.    Absence of Other Objections to Dr. Bivens' Testimony

1.

Kony also contends that Dr. Bivens' testimony improperly profiled him as a sex offender and that the statistical data referenced in his testimony was misleading and highly prejudicial.  Kony argues that, under HRE Rule 103,[9] he

---

[9]    HRE Rule 103(a) (2006) states:

(continued . . .)

maintained his objection to all of the evidence provided by Dr. Bivens by objecting to his entire testimony. However, under the circumstances of this case, we find that Kony did not preserve his objection for appellate review.

The circuit court in its motion in limine ruling specifically indicated that it was allowing Dr. Bivens' testimony only insofar as it addressed the issue of delayed reporting. During the motion in limine hearing, the court explained that it understood Kony's motion as requesting the court to preclude Dr. Bivens from taking the stand at all. While the court allowed Dr. Bivens to testify, the court instructed defense counsel to raise objections as counsel

---

(continued . . .)
>Effect of erroneous ruling. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and:
>
>>(1)   Objection. In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context; or
>
>>(2)   Offer of proof. In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked.
>
>Once the court makes a definitive ruling on the record admitting or excluding evidence, either at or before trial, a party need not renew an objection or offer of proof to preserve a claim of error for appeal.

determined appropriate, and the court would rule "question by question."

> Yeah.  Well, I understand.  I understand your position.  And in these kinds of cases the defense as a matter of course tries to keep Dr. Bivens off the stand and I understand why.
>
> I'm going to allow the State to call him on this issue of delayed reporting.  And obviously they're going to have to qualify him as an expert and then -- but that's the offer of proof and that's as far as I'm concerned what I'm going to allow as far as the testimony, and aside from that, we're just going to go question by question. [Prosecutor] will ask the question.  If you think it's objectionable, you go ahead and object, [Defense Counsel], and I'll rule question by question basically.

(Emphases added).

Despite the court's caveat regarding the limited nature of its in limine ruling, which permitted Dr. Bivens to testify on the limited issue of delayed reporting, Kony did not raise objections during trial on the grounds that Dr. Bivens' testimony consisted of profile evidence or that the statistical evidence was misleading or prejudicial.  In addition, the court reiterated during Dr. Bivens' testimony that it would entertain objections.  However, Kony's only objections were based on relevancy grounds as Dr. Bivens was referencing studies related to younger children.[10]

---

[10]    The defense objected twice during Dr. Bivens explanation of delayed reporting, once concerning prepubescent children and once regarding five and seven year-olds.  The court overruled the objection to allow the witness to finish the question but indicated that if Dr. Bivens continued to talk about five to seven-year-olds, the court would begin sustaining objections.  Similarly, Kony's third objection was to Dr. Bivens' testimony

(continued . . .)

HRE Rule 103(a)(1) requires a "specific" objection or a motion to strike if the ground is "not apparent from the context."  Vliet, 91 Hawai'i at 298-99, 983 P.2d 189, 199-200 (quoting Tabieros v. Clark Equip. Co., 85 Hawai'i 336, 379 n.29, 944 P.2d 1279, 1322 n.29 (1997)); see also State v. Kassebeer, 118 Hawai'i 493, 505, 193 P.3d 409, 421 (2008) (holding that the defendant waived the right to challenge testimony regarding the chain of custody of a handgun due to his failure to object); State v. Uyesugi, 100 Hawai'i 442, 464, 60 P.3d 843, 864-865 (2002) (noting that defendant has the burden under HRE Rule 103 to create an adequate record in order to preserve an error for review).

Under the specific circumstances of this case, where the defendant moved in limine to entirely exclude an expert from testifying but the evidence that the prosecution stated it intended to elicit was admissible, the defendant was specifically instructed by the court to object during the course of the trial to objectionable testimony, and the defendant did

---

(continued . . .)
regarding seducing and testing of a younger child, in which sexual touching by the molester is incorporated into the adult-child relationship.  Kony's objection, which was overruled, was that the testimony was irrelevant.  The defense's final objection to Dr. Bivens' testimony, which was sustained, was in regard to the "tunnel memory" effect observed in young children involved in car accidents.

not properly object, the requirements of HRE Rule 103 were not fulfilled.[11]  Kony therefore did not preserve his right to raise the issues of whether Dr. Bivens' testimony profiled him as a sex offender and whether the statistical evidence was unfairly prejudicial or misleading.  Accordingly, we do not consider the merits of Kony's arguments on these issues.  However, because the ICA's analysis assumed arguendo that Kony properly preserved his objections and concluded the objections were without merit, we provide guidance on the application of HRE Rule 403 to statistical evidence.[12]

## 2.

The expert testimony presented to the jury in this case included statistics regarding child sexual abuse, such as the following: "over 95 percent of sexual crimes are committed by males"; "a recent study showed that about 70 percent of molesters had a relationship with the child's parents"; "85 percent of sexual abuse victims have a pre-existing non-sexual relationship with their molester and "in Hawaii . . . a little

---

[11]     Plain error was not raised in the appellate briefs or the certiorari application.  Given the circumstances of this case, including the circuit court's multiple invitations for defense counsel to object to the testimony at issue and Kony's proffered defense, plain error review is not warranted.  See State v. Fox, 70 Haw. 46, 56, 760 P.2d 670, 676 (1988) (discussing the standard for plain error review).

[12]     We do not discuss Kony's contention that Dr. Bivens testimony improperly profiled him as a sex offender.

over 50 percent do have a family relationship . . . between the child and the molester"; and "a hundred percent of incest victims experience sexual abuse within their own home."

Although the ICA majority ostensibly evaluated the merits of Kony's argument that it was error for the trial court to admit the testimony because it was unduly prejudicial and misleading under HRE Rule 403, the ICA's analysis included no discussion of the potential prejudice of this statistical data. Additionally, there was no weighing of the potential for unfair prejudice against the probative value of Dr. Bivens' testimony. The ICA's analysis instead seems to find that, because Dr. Bivens' testimony is relevant and not categorically excluded, it must always be admitted when applying HRE Rule 403.[13] However, while expert testimony regarding child sexual abuse may be admissible to "assist the jury" under Batangan, it should only

_____

[13] In its ruling, the ICA states that "Hawaiʻi courts have consistently held that Dr. Bivens's generalized testimony 'was helpful to the jury and relevant to provide context to evaluate the behavior of the Child where normal indicia of reliability may not apply,'" and it cites to two unpublished dispositions of the ICA and Batangan in support of this proposition.

The ICA also seems to have found it significant that Dr. Bivens did not have any information about the case. While this appears relevant to the question of whether Dr. Bivens' testimony could be perceived as directly opining on Minor's credibility or Kony's guilt, it is not clear how the absence of such information by Dr. Bivens would address the potential prejudice of statistical evidence, and, in fact, it seemingly may have had the effect of enhancing prejudice by the factual match between the percentages and the circumstances presented at trial.

be admitted if it may be presented "without unduly prejudicing the defendant." Batangan, 71 Haw. at 557-58, 799 P.2d at 51-52. Said another way, Batangan does not exempt expert testimony concerning child sexual abuse victims from the weighing required by HRE Rule 403.

Under HRE Rule 403, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice or the danger of misleading the jury.[14] Because expert evidence "can be both powerful and quite misleading," "the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses." Vliet, 95 Hawaiʻi at 108, 19 P.3d at 56 (quoting Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 596 (1993)); see also United States v. Chischilly, 30 F.3d 1144, 1156 (9th Cir. 1994) ("[W]e take seriously the Court's admonition in Daubert that scientific evidence must withstand close scrutiny under Rule 403."), overruled on other

---

[14]     HRE Rule 403 provides as follows:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

HRE Rule 403 (1993).

grounds by United States v. Preston, 751 F.3d 1008 (9th Cir. 2014)).

Thus, "the possibility that the jury may be unduly influenced by the expert's opinion would mitigate against admission." Batangan, 71 Haw. at 562, 799 P.2d at 54 (quoting State v. Kim, 64 Haw. 598, 606, 645 P.2d 1330, 1337 (1982)). Indeed, the Batangan court expressly recognized that, even when probative, "[s]cientific and expert testimony, with their 'aura of special reliability and trustworthiness,' courts the danger that the triers of fact will 'abdicate [their] role of critical assessment,' and 'surrender [ ] their own common sense in weighing testimony.'" Batangan, 71 Haw. at 556, 799 P.2d at 51 (second and third alterations in original) (first quoting United States v. Amaral, 488 F.2d 1148, 1152 (9th Cir. 1973); then quoting State v. Brown, 297 Or. 404, 439, 687 P.2d 751, 773 (1984); and then quoting United States v. Azure, 801 F.2d 336, 341 (8th Cir. 1986)). The Batangan court recognized that expert testimony regarding the common behavior of child sexual abuse victims "carries the potential of bolstering the credibility of one witness and conversely refuting the credibility of another." Id. at 556, 799 P.2d at 51. Accordingly, the "pertinent consideration is whether the expert testimony will assist the jury without unduly prejudicing the defendant." Id.

Expert testimony that employs the use of statistics presents further hazards that courts must be sensitive to when applying the HRE Rule 403 weighing of the probative value against the danger of unfair prejudice or misleading of the jury.  See, e.g., Chischilly, 30 F.3d at 1156 ("Numerous hazards attend the courtroom presentation of statistical evidence of any sort.  Accordingly, Rule 403 requires judicial vigilance against the risk that such evidence will inordinately distract the jury from or skew its perception of other, potentially exculpatory evidence lacking not so much probative force as scientific gloss." (footnotes omitted)).  Commentators have also warned against "the use of probability evidence on crucial points in criminal prosecutions."  David McCord, Expert Psychological Testimony About Child Complainants in Sexual Abuse Prosecutions: A Foray into the Admissibility of Novel Psychological Evidence, 77 J. Crim. L. & Criminology 1, 55 (1986).  Such evidence may overwhelm the jury "to the extent that it attributes more probative value to the evidence than it actually has" and leads to "unfair prejudice, confusion of the issues, or misleading the jury."[15]  McCord, supra, at 58.

---

[15]     Dr. Bivens began his testimony by emphasizing that his statistics were trustworthy, stating that the studies he was citing were "significant" because they were "regarded as being done very well on this topic."  Although Dr. Bivens did state that statistics have some margin of error, he also

(continued . . .)

Additionally, statistical evidence regarding the behavior of offenders and victims may undermine the reasonable doubt standard to the extent that such data is used by the jury in making its ultimate determination regarding a defendant's guilt.[16]  Id. at 56-58.  A fundamental problem of such testimony is that it "invites the jury to convict the defendant on the basis of a statistical probability rather than on the basis of the evidence in the case."  Id. at 55.  However, the idea of reasonable doubt requires proof connecting the defendant to the crime and does not permit proof that a defendant is more likely to be guilty because he or she may share characteristics or traits with discrete populations of offenders.[17]

---

(continued . . .)
stated that "[t]he studies that I'll be talking about today have enough individuals included in the study so that the percentages are relatively reliable."  He also stated, "Percentages should only be used to be given a general idea of, you know, how the phenomenon most often occurs."

[16]     See Laurence H. Tribe, Trial by Mathematics: Precision and Ritual in the Legal Process, 84 Harv. L. Rev. 1329, 1372-75 (1971).

[17]     See State v. Transfiguracion, No. SCWC-11-0000048 2013 WL 1285112, at *6 (Haw. Mar. 28, 2013) (Order Rejecting Application for Writ of Certiorari) (Acoba, J., dissenting); see also State v. Claflin, 690 P.2d 1186, 1190 (Wash. Ct. App. 1984) ("An opinion that the defendant statistically is more likely to have committed the crime because of his membership in a group--in this case, his paternalistic relationships to the victims--is inadmissible."); Hall v. State, 692 S.W.2d 769, 773 (Ark. App. 1985) (rejecting evidence that "in 75% to 80% of such cases the perpetrator is known to the children involved" and "50% of child sexual abuse cases occur in either the home of the child or the perpetrator" because it "was not of proper benefit to the jury," "tended to focus the attention of the jury upon whether the evidence against the defendant matched the evidence in the usual case involving the sexual abuse of a young child," and was "distractive and prejudicial").

A court should also consider the manner in which the statistical information is presented because statistical evidence has the potential to be misleading and given undue weight by the jury based on how it is adduced. For example, commentators have observed that statistics in sexual abuse cases may mislead the jury based on the manner in which the statistical information is presented. See Thomas D. Lyon and Jonathan J. Koehler, The Relevance Ratio: Evaluating the Probative Value of Expert Testimony in Child Sexual Abuse Cases, 82 Cornell L. Rev. 43, 47 (1996). Testimony that a percentage of offenders or victims have a particular characteristic may be misleading unless the percentage of all persons with the relevant characteristic that are offenders or victims is also stated. Thus, a statistic that 95 percent of burglaries are committed by persons within a certain economic group has the potential to be serious misleading without also stating the percentage of all persons within that economic group who commit burglaries.

In this case, Dr. Bivens testified that "over 95 percent of sexual crimes are committed by males." However, testimony that 95 percent of a certain category of criminal offenders are male would not appear to assist the jury in comprehending something not commonly known or understood. See

Batangan, 71 Haw. at 562, 799 P.2d at 54. And, even assuming admissibility, there appears to be little or no probative value that may be discerned by admission of this evidence. Further, the manner in which the statistic was presented had the potential to be misleading because the fact that 95 percent of sexual abusers are male does not indicate the probability that a person with the relevant characteristic--here, that of being male--is also an offender. The percentage of all men who sexually abuse children was not stated by Dr. Bivens, and without such context, the testimony appears significantly misleading.

This is not to suggest that providing the jury with additional statistics is the appropriate approach to rectify problematic statistics. Instead, when statistics are potentially misleading, in posing a risk, for example, that the jury may consider that the defendant's relationships or characteristics make it more likely that the defendant committed the offense, then the court must carefully weigh the danger of improper influence upon the jury in its HRE Rule 403 analysis of the proffered testimony.[18] See Vliet, 95 Hawai'i at 108, 19 P.3d

_____

[18]     See State v. Petrich, 683 P.2d 173, 180 (Wash. 1984) (precluding on retrial expert's testimony that in "eighty-five to ninety percent of our cases, the child is molested by someone they already know," as it "invites the jury to conclude that because of defendant's particular relation
                                                          (continued . . .)

at 56 ("Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it.  Because of this risk, the judge . . . under Rule 403 . . . exercises more control over experts than over lay witnesses." (quoting Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 596 (1993)).

As stated, the testimony in this case included numerous statistical percentages: "70 percent of molesters had a relationship with the child's parents"; "a hundred percent of incest victims experience sexual abuse in their home"; and that "85 percent of sexual abuse victims have a pre-existing[,] non-sexual relationship with their abuser," and in Hawai'i specifically, "50 percent do have a family relationship." Because the ICA considered that an adequate objection was made to this evidence, the ICA should have taken into account the problematic nature of these statistics in considering whether their probative value was substantially outweighed by the danger of unfair prejudice or whether the evidence was misleading.

---

(continued . . .)
relationship to the victim, he is statistically more likely to have committed the crime"), overruled in part on other grounds by State v. Kitchen, 756 P.2d 105 (Wash. 1988); Stephens v. State, 774 P.2d 60, 64 (Wyo. 1989) (observing that it was "difficult [ ] to understand how statistical information would assist a trier of fact in reaching a determination as to guilt in an individual case" in reviewing expert's testimony that informed the jury "that statistically eighty to eighty-five percent of child sexual abuse is committed by a relative close to the child"), overruled in part on other grounds by Large v. State, 177 P.3d 807, 816 (Wyo. 2008).

Judge Reifurth noted in his concurring opinion that the ICA majority's approach seems to admit expert testimony "so long as it may be deemed contextually relevant." We agree with Judge Reifurth that this "is not the right measure" and that "the potential prejudice of such evidence should be assessed against its probative value." However, because Kony did not properly preserve his argument that the testimony was unduly prejudicial or misleading, we need not consider the extent of any unfair prejudice to Kony or the possibility of misleading of the jury under HRE Rule 403.

## IV. Conclusion

Batangan instructs that "[c]ourts must proceed with caution in admitting expert testimony" in cases involving the sexual abuse of children. Batangan, 71 Haw. at 562, 799 P.2d at 53. Such evidence is admissible if it will "assist the jury to comprehend something not commonly known or understood," such as "seemingly bizarre behavior of child sex abuse victims." Id. at 557-58, 799 P.2d at 52-54. If the evidence will assist the jury, then the court, upon objection, must determine the probity of the evidence in relation to the danger of unfair prejudice, any misleading aspects of the evidence, or potential for undue influence. See id. at 556, 799 P.2d at 51. In making this determination, courts must recognize that "this type of expert

testimony carries the potential of bolstering the credibility of one witness and conversely refuting the credibility of another." Id. at 558. Consequently, expert testimony of this nature should be carefully evaluated under HRE Rule 403 to ensure that proffered statistical evidence is not misleading or unfairly prejudicial.

For the reasons discussed and in light of the record in this case, the November 28, 2012 Judgment of Conviction and Sentence and the ICA Judgment on Appeal are affirmed.


John M. Tonaki and                    /s/ Sabrina S. McKenna
Jon N. Ikenaga
for petitioner                        /s/ Richard W. Pollack

Donn Fudo                             /s/ Michael D. Wilson
for respondent