*** FOR PUBLICATION IN WEST'S HAWAIʻI REPORTS AND PACIFIC REPORTER ***

Electronically Filed
Supreme Court
SCWC-15-0000724
12-JUN-2020
07:57 AM

IN THE SUPREME COURT OF THE STATE OF HAWAIʻI

---o0o---

_____

STATE OF HAWAIʻI
Respondent/Plaintiff-Appellee,

v.

JASON ENGELBY,
Petitioner/Defendant-Appellant.

_____

SCWC-15-0000724

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-15-0000724; CR. NO. 12-1-1899)

JUNE 12, 2020

RECKTENWALD, C.J., NAKAYAMA, AND McKENNA, JJ.;
AND WILSON, J., DISSENTING, WITH WHOM POLLACK, J., JOINS

OPINION OF THE COURT BY RECKTENWALD, C.J.

## I. INTRODUCTION

Jason Engelby was found guilty by a jury of two counts of Sexual Assault in the First Degree for molesting a minor child (Child), the daughter of a close friend, when Child was nine and ten years old. Engelby appealed, and the Intermediate

Court of Appeals (ICA) affirmed.  On certiorari, we must assess Engelby's claim that Dr. Alexander Bivens, the State's expert witness in child sexual assault dynamics, impermissibly bolstered Child's credibility.[1]

The testimony that Engelby seeks to challenge now was not introduced during the State's case-in-chief.  Rather, during its cross-examination of Dr. Bivens, the defense initiated a discussion about the credibility of alleged victims of child sexual assault, apparently to develop a theory that Child's memories of the alleged assaults may have been suggested to her by someone else.  Specifically, the defense elicited testimony from Dr. Bivens that distinguished the circumstances in which a child would intentionally make false allegations about sexual assault from the circumstances in which a child would be susceptible to the implantation of false memories by third parties.  The State further developed that testimony on re-direct examination, without any objection by the defense.

Having used Dr. Bivens' testimony on children's general credibility to his own advantage, and having failed to object when the State elicited further testimony on re-direct examination, Engelby should not now be able to challenge that testimony on the basis of impermissible bolstering.

---

[1] Engelby's application for writ of certiorari also challenges Dr. Bivens' testimony on a number of other grounds.  As discussed more fully below, the other issues raised by Engelby are without merit.

Accordingly, we affirm the ICA's judgment on appeal.

## II. BACKGROUND

The State charged Engelby with two counts of Sexual Assault in the First Degree in violation of HRS § 707-730(1)(b).[2] The charges alleged that Engelby had molested Child on multiple occasions between December 1, 2011 and December 4, 2012.[3]

### A. Hawai'i Rules of Evidence Rule 104(a) Hearing

Both parties had filed motions in limine prior to trial to determine whether Dr. Bivens was qualified to testify as an expert witness and, if so, what the appropriate scope of his testimony would be. The State moved for the court to qualify Dr. Bivens as "an expert witness on the dynamics of child sexual assault," and asserted that Dr. Bivens' testimony would address the dynamics of child sexual assault and cover patterns of behavior exhibited by child victims of sexual assault "which [might otherwise seem] inconsistent with [the] behavioral norms of other victims of assault[,]" such as delayed

---

[2]     Hawai'i Revised Statutes (HRS) § 707-730(1)(b) (2014) (Sexual Assault in the First Degree) provides that "[a] person commits the offense of sexual assault in the first degree if [t]he person knowingly engages in sexual penetration with another person who is less than fourteen years old."

The State also charged Engelby with five counts of Sexual Assault in the Third Degree in violation of HRS § 707-732(1)(b) (2014). These charges were dismissed as defective, however, at a pretrial hearing on June 22, 2015.

[3]     The Honorable Colette Garibaldi presided.

reporting and tunnel memory.[4]  Engelby requested the court to conduct a hearing "to determine the qualifications and relevance of [Dr. Bivens'] testimony."

Following the parties' opening statements and testimony from the State's first witness, Detective Brian Tokita with the Honolulu Police Department (HPD), the circuit court conducted a Hawai'i Rules of Evidence (HRE) Rule 104(a) hearing outside the presence of the jury to determine these issues.

The defense objected to Dr. Bivens testifying at trial.  First, the defense explained that it was "not challenging [] any of the contents of [Dr. Bivens'] curriculum vitae."  Instead, the defense challenged his proffered testimony by arguing that it would be irrelevant and unduly prejudicial, improperly bolster the State's witnesses, usurp the function of the jury, and improperly profile Engelby as a child molester. The defense explained:

> We are objecting based on not just [State v.] Batangan, [71 Haw. 552, 799 P.2d 48 (1990),] but we're objecting for irrelevance.
>
> We are objecting that it would be unduly prejudicial to Mr. Engelby because it would be considered improper bolstering, and also we would object that it would also be improper profiling, and profiling of what a person who would commit these kinds of offenses may or may not be, and we would argue that that would be inherently prejudicial.
>
> Also, we object that it would be usurping the function of the jury, that the jury can determine,

---

[4]     At trial, Dr. Bivens described the phenomenon of tunnel memory as an individual's enhanced recall of the details central to a traumatic event and weaker recall of the details peripheral to that event.

> from listening to the witnesses, whether or not they
> choose to feel someone's credible or not, and it
> would violate my client's rights under the due
> process clause.

The defense contended that delayed reporting in cases of child sexual abuse was "part of the general knowledge of the public," and that expert testimony on that topic was therefore not necessary. The defense also questioned whether Dr. Bivens was qualified to address tunnel memory, and requested that the term "grooming" be "in limined" out.

In response, the State asserted that Dr. Bivens' testimony was relevant, and that testimony on "the dynamics of a sexual assault by a family member or someone close to the family" would assist the jury in understanding how children might experience and react to sexual abuse within the home. The State explained that this dynamic was not familiar to lay people, and that children's reactions in this type of situation might differ from the reactions that a person of ordinary understanding might otherwise expect. The State also clarified, inter alia, that it sought to elicit testimony from Dr. Bivens about delayed reporting and tunnel memory, that Dr. Bivens "would not be commenting on anyone's credibility or believability[,]" and that it would make clear to the jury that Dr. Bivens had no familiarity with the case or its witnesses.

The circuit court ruled that Dr. Bivens' testimony was relevant, noting that:

> The Court is not in agreement with the defense in terms of this being general knowledge to which the jury does not need assistance . . . . [T]he Court does believe that . . . the testimony of an expert would be of assistance to the jury with respect to specifically, the behaviors that are associated with this type of offense for delayed reporting and, perhaps, inconsistent reporting.

The circuit court further ruled:

> [Dr. Bivens can] testify to his experience and research on delayed disclosure . . . [,] children's reaction[s] to the event[s,] and [] explanation[s] of the manner[s] of disclosure and the reasons for the delay[s].

> At this point[,] the court will leave outstanding the testimony associated with tunnel memory, unless and until [Dr. Bivens] can be qualified that he's able to testify as to tunnel memory[.] [Additionally,] I'll grant the [defense's] oral motion to in limine out the word "grooming" in [Dr. Bivens'] testimony.

**B.    Dr. Bivens' Testimony**

Dr. Bivens was the next witness called by the State. After Dr. Bivens testified as to his credentials and qualifications, the circuit court qualified Dr. Bivens as an expert witness in clinical psychology "with [an] emphasis in the general dynamics of child sexual assault."

**1.    Direct Examination**

Dr. Bivens first explained that, in the context of child sexual assault, studies consistently showed "that sexual abuse most often occurs in the context of a preexisting relationship, preexisting nonsexual relationship between the adult and the child."  Furthermore, he explained that in his own practice, he could only recall "a couple of cases . . . [of] stranger abuse[,]" and that "[m]ost often, [the molester would

6

be] someone [that the child] . . . knew well" and that the child and family trusted.

Relating to delayed disclosure, Dr. Bivens testified that "[d]elay[ed disclosure] [was] the rule, [rather than] the exception" for children who had been sexually assaulted, and that "the most common thing [for children to] do when molested [was to] not say anything for a long time." He explained that it was not atypical for children to wait months or years to disclose their abuse, and also not atypical for them to "allow the abuse to continue . . . for a long period of time before disclosing." He explained, "[t]he closer the relationship between the abuser and the child, the longer it [would] take to disclose."

Dr. Bivens further discussed the most common reasons for children's delayed disclosures, including fear of not being believed, embarrassment, and not wanting to harm anyone, as well as the types of situations that would prompt disclosure. He then explained that children most often disclosed to their "mothers and close friends[,]" and that children's initial disclosures often contained incomplete information.

Dr. Bivens also explained that he was familiar with research on the topic of tunnel memory and that he dealt with patients "every week" within his clinical practice who were experiencing tunnel memory. Based on this testimony, the

7

circuit court ruled that Dr. Bivens had adequately laid a foundation to testify on this topic.[5]  With regard to tunnel memory, Dr. Bivens then explained that while "the details of the sexual abuse" would be remembered well by victims, peripheral details, such as "the dates and times" of the occurrences, "[would be] remembered less well."

Dr. Bivens also discussed the typical interactions children had with their molesters, including: (1) "loving, seductive relationship[s]"; (2) "playful relationship[s] that [would] begin[] to involve sexual touching"; (3) "coercive relationship[s]"; and/or (4) "feeling taken advantage of[,]" in which the touching would occur while the children were sleeping. Dr. Bivens also testified that "there are two places where child sexual abuse most often occurs, and that it is the child's own home and in the molester's own home."

The State did not ask Dr. Bivens to comment on children's credibility on direct examination, and Dr. Bivens did not do so.  Further, Dr. Bivens emphasized that he had never spoken with nor met the witnesses in the instant case and was unfamiliar with the case's facts.  He explained, "I've just been talking about general dynamics.  And, in fact, the material that

_____

[5]     On appeal to the ICA, Engelby argued that the circuit court erred by permitting Dr. Bivens to testify on the topic of tunnel memory.  Based on the record, however, we conclude that the circuit court did not abuse its discretion in this regard.

8

I've shared today is very similar to the general dynamics training that I do.  It's just [in] a longer format when I do that training."

## 2.  Cross-Examination

The subject of children's credibility was first raised on cross-examination, when the defense asked Dr. Bivens how he would "distinguish compromised recall from a situation where the child might be lying in the context of, say, a divorce where parties are fighting and maybe a child [would be] compelled to lie[.]"  In response, Dr. Bivens explained:

> [T]hat would depend a lot upon, you know, the nature of the report.  There are certain kinds of lies that are much less common for children to tell, children are less likely to lie.  If [] there are known consequences or likely consequences that are going to befall somebody else [-] that would require certain kinds of malicious qualities that tend to be rare.
>
> On the other hand . . . [,] in the cases that I've worked on where there were divorce problems, the child wasn't necessarily the source of the report. The reports were coming [in] secondhand.  So there are a number of factors that you can look at.

(emphasis added).

The defense then asked Dr. Bivens to "comment on the phenomena of rehearsal[,] . . . implant[ing] a memory, or suggestibility[.]"  The following discussion ensued:

> DR. BIVENS:  So there is research on suggestibility. It is possible to implant a memory into a child's mind.  Interestingly, it is also possible to implant [a] memory into an adult's mind if you have enough [] knowledge about what you're doing.
>
> In the case of children, implantation of memories is more common and more likely to occur with very young children, preschool age. . . .  By the time you reach age seven, you're talking about a child who is going

9

> to be more resistant to this type of thing, <u>although with enough concerted effort and enough technology you probably could pull it off in a seven-year-old also.</u>
>
> DEFENSE: <u>And a concerted effort could just mean [] – an adult repeating something over and over again, it doesn't necessarily mean like they have to use the Internet or –</u>
>
> DR. BIVENS: No, over and over again. Repeated implantation[.]

(emphases added).

### 3.    Re-Direct Examination

On re-direct examination, the State asked Dr. Bivens to explain "a little bit" more about false reporting and suggestibility.  The defense did not object at any point during this discussion.

> STATE: <u>Now, doctor, you were just asked a few questions regarding false allegations or suggestibility.</u>  Were there any . . . pivotal studies that you're aware of that address this issue[?]
>
> DR. BIVENS: Yes.
>
> STATE: Can you tell us about that?
>
> DR. BIVENS: I certainly can.  So in the 1980s, there were several [] unfortunate incidents in which preschool children were [] inappropriately interviewed by well-minded people who believed there was a phenomenon of satanic ritualistic sexual abuse that was happening to these children.  There was no particular evidence of it and none of the children really reported anything prior.  But upon multiple, multiple interviews[,] these preschool age children, four and five, were pressured and otherwise coerced into making statements[,] and some of the children came to believe those statements.
>
> It was a result of [] those incidents and the studies that [] looked at how that was accomplished and the practices that we use today to conduct investigation were developed to always avoid suggesting anything or bringing up the topic of anything that might have occurred.  And, in fact, when I consulted with the Children's Justice Center, these appropriate practices are exactly the kind of thing that I talked

10

to them about. So we know a lot about suggestibility, [and] again, [it is] more common in younger [children], and we work to avoid it as investigators.

STATE: So that was basically a learning experience, that situation that occurred in the 1980s?

DR. BIVENS: For [] the field of investigating claims of child sexual abuse[,] yes, it was.

STATE: And . . . how have interviewers been . . . trained differently since then?

DR. BIVENS: [N]ow we have a very standardized process that we use to train our interviewers. . . . [O]ur practices have [] become dramatically better. [W]hat we find is that under appropriate interviewing conditions, we get very accurate reports from children. And this is tested frequently.

STATE: And based upon your research and . . . your clinical experience, are you familiar with . . . false reporting and [] how often that occurs?

DR. BIVENS: I am.

STATE: Okay. Can you tell us a little bit about that?

DR. BIVENS: I can. So the possibility or problem that children could lie is a deep concern to us as psychologists and so we study children lying. It is possible to get a child to lie and we know a good bit about [] what is required and the kinds of lies that children are likely to tell.

The easiest kind of lie to get a child to perform is one where they simply withhold information or deny having information, basically saying nothing happened or I don't know what happened in exchange for a reward with very low stakes. In other words, nobody really gets in trouble. So it's sort of like hey, where did that cookie go? I don't know. That's an easy kind of lie to get a child to tell.

The most difficult kind of lie to get a child to tell would be to get them to say something to – to come out with something that's incorrect that didn't happen and when the child knows that there's going to be a significant consequences for another person. And so that's what . . . our research shows on a child lying. As far as false allegations of child sexual abuse goes, there's been a great deal of concern about this and there have been controversies in the scientific field as well. But all of the most recent research indicates that children independently

11

> are not likely to be sources of false allegations even in . . . the context of divorce.  We would be more likely to find a parent saying that a child said.  But in terms of an independent report emanating from a child, those are very infrequently found.

(emphases added).

## 4.    Re-Cross Examination

The topic of credibility was raised again during re-cross examination, when the defense asked Dr. Bivens to "follow up on the suggestibility portion" of his testimony.  This was the only subject the defense raised.

> DEFENSE:  So you shared with us that based on what happened in the '80s, changes were made to the training [] so that professionals who interview children have better techniques now; correct?
>
> DR. BIVENS:  [T]hey really do, yes.
>
> DEFENSE:  But suggestibility with a trained professional is – those special techniques and everything may not apply to, say, a parent, a family member or someone involved who doesn't have that training; correct?
>
> DR. BIVENS:  That is correct.
>
> DEFENSE:  Okay.  So there is still that risk where nonprofessionals are involved when they're questioning a child about certain things that they may or may not be accusing someone of?
>
> DR. BIVENS:  Yes.  Particularly if this is on a repeated, sustained . . . basis where the parent is convinced that a certain result is what they're trying to get out of a child.
>
> DEFENSE:  And would [] a reward system be a factor as well?  I believe you shared with us that sometimes children, if they are induced . . . with gifts or presents that they may be inclined to keep secrets. But would you also agree that they may be inclined to lie as well?
>
> DR. BIVENS:  [M]aybe the easiest way that I can answer your question is to say that one of the practices [] we always refrain from as professionals is we don't offer, you know, ice cream sandwiches if

12

> you talk about the sex things that were done to you,
> right.  So . . . we specifically do not offer rewards
> for that specific reason.
>
> DEFENSE:  [A]s trained professionals?
>
> DR. BIVENS:  Correct.

(emphases added).

## C.    Other Witness Testimony

In addition to the testimony of Detective Tokita and Dr. Bivens, the State presented testimony from another HPD investigator, as well as from Child, Child's older sister, and Child's mother and her boyfriend.

Child testified that Engelby came over to her house "a lot" as she was growing up, and that she and Engelby were "close."  Child testified that it was not uncommon for Engelby to spend the night at her family's house, sleeping either in the living room or the room she shared with her older sister.

Child testified that Engelby began "touching her in ways she didn't like" in December 2011 and that this touching continued until December 3, 2012.  She testified that she could not remember each day that he sexually abused her "because it happened a lot."

According to Child, Engelby touched her on multiple occasions while she slept in the living room; once after an outing at Ice Palace for her tenth birthday; and the night of December 3, 2012, after she had fallen asleep in her bedroom. Child testified that she did nothing when he touched her or

licked her "vagina area[,]" and that she felt scared and confused because she "didn't know why he would do such a thing." She explained that she did not scream when he touched her because it was "shocking" and because she "didn't know what to do." She testified that Engelby would buy her clothes and earrings, and would occasionally slip money into her hand after he was done touching her.

Initially, Child explained, she did not tell anyone about what Engelby was doing because she did not think anyone would believe her. Later, however, she told her older sister and mother.

Child's older sister, as well as Child's mother and her boyfriend, corroborated many aspects of Child's testimony. Child's sister, for instance, testified that "Uncle Jason" would come over to her family's home a lot, including late at night. She testified that Engelby would sleep at their home, sometimes "lay[ing] down" in the bedroom she shared with Child, and "once in a while" laying down in Child's bed. She explained that when Child told her about the sexual abuse, "it was hard for [Child] to explain what she wanted to say" because "[s]he was crying and stuttering."

Child's mother explained that Engelby was like family to her, and that he was "welcome to come and go [within the family's home] as he pleased." She further testified that

14

Engelby could sleep over wherever he wanted to within the home, and that sometimes, she would go to sleep while Engelby was over, unaware of his exact location. Child's mother, as well as her boyfriend, testified that Engelby not only had a key to the home, but was also present the night of December 3, 2012 and the morning of December 4, 2012, when the last incident allegedly occurred.

According to Child's mother, she and her boyfriend were up that night to make periodic checks on her oldest daughter's dog, which was dying. It was during one of those checks, she explained, that she first saw Engelby in her home. She testified that she wasn't shocked at Engelby's presence, and that throughout the night, he helped them take care of the dog. The mother's boyfriend testified that, at some time between 12:30 and 2:00 a.m., he noticed Engelby in Child's room on a folding mattress, illuminated by his phone. According to Child's mother, Child first disclosed her allegations against Engelby the evening of December 4th.

**D.  Engelby's Testimony**

Engelby then testified as the defense's sole witness. Engelby explained that while he had always had a close relationship with Child's family, and while he had lived with Child's family for about a year in 2008 or 2009, he became more distant from them when he moved in with his girlfriend in 2010.

15

Furthermore, he explained, although he had a key to Child's home when he lived with Child's family, the family had changed the locks in 2010. As such, he denied having a key to the home at the time the alleged incidents occurred.

Engelby testified that he had never touched Child in a sexual manner. And, while he admitted to taking Child to Ice Palace for her tenth birthday, he contended that he had not been alone with her that day, as his girlfriend and her daughter met them there. Engelby explained that while he had slept over at Child's home in 2011, he did so as a favor to Child's mother, who needed someone to take care of her children as she gave birth in the hospital.

Engelby denied ever spending the night at Child's home in 2012, and denied visiting the home the night of the last alleged incident, as Child's mother and her boyfriend alleged.

**E. Jury Instructions**

After the testimony had concluded, but before the parties' closing arguments, the circuit court provided the following instructions to the jurors explaining how they should weigh the evidence:

> COURT: During the trial you heard the testimony of one or more witnesses who were described as experts. Training and experience may make a person an expert in a particular field. The law allows that person to state an opinion about matters in that field.
>
> Merely because a witness has expressed an opinion does not mean, however, that you must accept this opinion. It is up to you to decide whether to accept

> this testimony and how much weight to give it. You
> must also decide whether the witness's opinions were
> based on sound reasons, judgment and information.

(emphasis added).

## F.    Closing Arguments

Both the State and defense focused on the witnesses' credibility in their closing arguments.

The State explained that Child's testimony established the "elements of each count beyond a reasonable doubt[,]" and told the jury that "if you believe[d] [Child], it's over." The State made no references to Dr. Bivens' statements about children's propensities for truthfulness, and only addressed his testimony as follows:

> STATE:  Dr. Bivens came in here and [] gave you all a
> little insight into the way children who are sexually
> abused typically respond. The way [Child] responds
> under these circumstances makes sense. Her testimony
> was reasonable.
> . . . .
> [A]gain, Dr. Bivens just shared with you some of the
> common experiences of children who are sexually
> abused and that it's typical for those children to
> play possum because they're scared or confused. Most
> of them do not disclose until a while later and most
> disclose to a mother or a close friend. And he
> basically [] talked a little bit about his experience
> through research and through treating children who
> are sexually abused.

The defense, on the other hand, attempted to cast doubt on Child's credibility by putting forth a theory of suggestibility. Specifically, the defense focused on the fact that Child, despite earlier opportunities to do so, did not initially disclose her allegation that Engelby had put his mouth on her vagina. The defense thus contended:

17

DEFENSE: In addition, [Child] has testified that she felt a mouth licking her vagina. The defense asks you to recall that [Child] did not say anything about a mouth on her vagina, let alone any sort of licking of her vagina, when she talked to the detective, when he went to gather her clothing, okay, and when she later spoke with him at the Children's Justice Center.

So let's talk about the Children's Justice Center for [] a second. This is a special place where children are interviewed with trained professionals. It's a safe environment, not a cold . . . room at the HPD. It's a special center designed to interview children by professionals. And she never mentioned [the licking] during her interview with the detective.

So let me clarify. [Child] didn't say anything about a mouth on her vagina when she's interviewed and when they're collecting her clothes and the detective is doing his gathering of evidence. And she said nothing about a mouth on her vagina when she got interviewed at the Children's Justice Center. It's only 16 days later [at a grand jury proceeding],[6] after she had all this time to be talking with her family or whatever that she decides to start saying that.

It is not credible that a ten-year-old girl would simply forget that a man had his mouth on her vagina and was licking it. And it's not credible that she would wait to say something about it if it actually did happen. And the defense submits that this is evidence that is simply just not true. That this is added, that she may have been influenced by what someone else said or influenced by who knows, suggestion.

We don't know. But there is a problem with this reporting. Adding something later does not make it true and does not make it accurate. That is a reasonable doubt about whether or not it even happened. The defense submits that [Child's] accuracy is in question and this omission, this failure to mention anything about [a] mouth on [her] vagina when she first got interviewed by the detective who sat down with her, is important.

(emphases added).

In rebuttal, the State again emphasized the topic of

---

[6] Child first alleged that Engelby had licked her "vagina area" at a grand jury proceeding that took place on December 20, 2012.

credibility, but did not refer to any aspects of Dr. Bivens'
testimony on that matter.  In sum, the State argued:

> STATE:  If you believe [Engelby,] that means you
> don't believe any of the other witnesses in this case
> because his testimony is the only one that goes
> astray.  And he is the only person that has motive to
> lie here. . . .  To protect himself.
> . . . .
> You have heard all the evidence in this case[.]
> [Child] is credible.  She's not mistaken, she was
> very clear in her detailed testimony.  And she has no
> reason to lie.  The defendant sexually assaulted her
> and he betrayed that family's trust.  Find him guilty
> as charged.

## G.    Engelby's Conviction, Sentence, and Appeal

Engelby was found guilty of two counts of Sexual
Assault in the First Degree and was sentenced to two concurrent
twenty-year terms of imprisonment.  On appeal to the ICA,
Engelby contended that Dr. Bivens' testimony denied his rights
to due process and a fair trial.

The ICA affirmed.  The ICA concluded that Dr. Bivens'
testimony was both relevant and helpful to the jury, and that it
neither impermissibly profiled nor unduly prejudiced Engelby.
The ICA declined to consider Engelby's claim that Dr. Bivens'
testimony improperly relied on statistics to profile Engelby as
a molester, on the basis that the issue had not been properly
preserved for appeal.  The ICA further concluded that "Dr.
Bivens did not opine on [Child's] credibility [] or testify
about the facts of the particular case."  Thus, the ICA rejected
that Dr. Bivens had bolstered Child's credibility merely because
the "details of [Child's] story match[ed] the details of a

19

typical child sex abuse case."

Engelby timely filed an application for writ of certiorari.

## III. STANDARDS OF REVIEW

### A. Admission of Opinion Evidence (Expert Testimony)

"Generally, the decision whether to admit expert testimony rests in the discretion of the trial court. To the extent that the trial court's decision is dependent upon interpretation of court rule[s], such interpretation is a question of law, which [the appellate] court reviews de novo." State v. McDonnell, 141 Hawai'i 280, 289, 409 P.3d 684, 693 (2017) (citing Barcai v. Betwee, 98 Hawai'i 470, 479, 50 P.3d 946, 955 (2002)).

### B. Plain Error Review

Pursuant to Hawai'i Rules of Penal Procedure Rule 52(b) (2012), this court may notice "[p]lain errors or defects affecting substantial rights . . . although they were not brought to the attention of the court." We have noted, however, that the "power to deal with plain error is one to be exercised sparingly and with caution," given that "the plain error rule . . . depart[s] from a presupposition of the adversary system – that a party must look to his or her counsel for protection and bear the cost of counsel's mistakes." State v. Nichols, 111 Hawai'i 327, 335, 141 P.3d 974, 982 (2006) (citation

20

and quotation omitted).

## IV.  DISCUSSION

### A.    Issues Raised on Certiorari

Engelby raises the following question on certiorari:

Whether the ICA gravely erred in affirming the
circuit court's ruling allowing Dr. Bivens to testify
because his testimony was (1) irrelevant and
misleading; (2) stated "facts" or "characteristics"
based on statistics (although not citing
percentages); (3) improperly bolstered [Child]'s and
her mother's credibility; (4) improperly profiled
Engelby as a child molester; (5) taken in totality,
was unduly prejudicial to Engelby; and (6) did not
assist the jury in understanding the evidence
[]because the evidence was logically comprehensible
by jurors of common understanding, in violation of
Engelby's rights to due process and fair trial.

### B.    The Issue of Children's Credibility

Engelby seeks to challenge the admission of statements
made by Dr. Bivens concerning false allegations and
suggestibility of children.  Since Engelby did not object at any
time to that testimony while Dr. Bivens was testifying, we
review for plain error.

Dr. Bivens' direct testimony did not address the
credibility of alleged victims of child sexual abuse.  Rather,
the defense raised that issue on cross-examination, apparently
in order to suggest that Child's memories of Engelby's assaults
were the result of suggestion.  To develop this theory, the
defense sought to elicit testimony from Dr. Bivens that
distinguished between a child's propensity to make false
allegations and a child's susceptibility to suggestion.

21

Dr. Bivens' first statement about children's credibility was made during cross-examination, in response to the defense asking him how he would "distinguish compromised recall from a situation where . . . a child [would be] compelled to lie[.]" The defense continued by asking Dr. Bivens to "comment on the phenomen[a] of rehearsal[, . . . ] implant[ing] a memory, or suggestibility[,]" to which Dr. Bivens replied, that in his experience, "[i]t [was] possible to implant a memory into a child's mind." On re-cross examination, the defense emphasized this point by asking Dr. Bivens to "follow up on the suggestibility portion" of his testimony. Indeed, on re-cross examination, this was the only topic broached. It thus appears that the defense elicited this testimony to help develop its theory in closing that "[Child] may have been influenced by what someone else said or by[,] who knows, suggestion."

Moreover, the challenged testimony elicited by the State appears to align with the defense's theory. Dr. Bivens' statement that "children independently are not likely to be sources of false allegations" did not bolster Child's credibility where the defense's theory was not that she was a liar by nature, but rather, that she was influenced to lie.

The defense never objected to nor moved to strike the challenged portions of Dr. Bivens' testimony at trial. Accordingly, Engelby did not properly preserve his claim about

22

bolstering, and waived his ability to challenge the statements under HRE Rule 103(a)(1), which states that "[e]rror may not be predicated upon a ruling which admits . . . evidence unless a substantial right of the party is affected, and . . . a timely objection or motion to strike appears on the record."  (emphasis added).  See State v. Metcalfe, 129 Hawai'i 206, 224, 297 P.3d 1062, 1080 (2013) (point on appeal was forfeited because defense did not object to expert's testimony at trial).

While the defense challenged Dr. Bivens' ability to testify as an expert witness in the Rule 104 hearing prior to his testimony, and claimed that his testimony would impermissibly bolster Child's testimony, this general objection to his testimony was not sufficient to preserve his current objection to the statements about credibility now at issue.  See Kobashigawa v. Silva, 129 Hawai'i 313, 322, 300 P.3d 579, 588 (2013) ("[A]s is generally true for appellate review of any issue, the failure to object to evidence introduced after denial of a pretrial motion in limine to exclude that same evidence will result in waiver of the objection on appeal."); State v. Kony, 138 Hawai'i 1, 10-11, 375 P.3d 1239, 1248-49 (2016) (holding that defendant waived claims of improper profiling and expert's use of statistical data when defendant only made general objections to expert's testimony and failed to object to particular aspects of expert's testimony at trial); cf. HRE Rule

23

103(a) ("Once the court makes a definitive ruling on the record admitting or excluding evidence, either at or before trial, a party need not renew an objection . . . to preserve a claim of error for appeal."); Craft v. Peebles, 78 Hawai'i 287, 294, 893 P.2d 138, 145 (1995) ("unequivocal" in limine rulings were noticeable on appeal despite failure to challenge at trial). Contrary to the dissent's suggestion, it cannot be said that the circuit court made "definitive" pretrial rulings with regard to this testimony. See Dissent at 11-12.

Thus, in order to preserve his claims about bolstering in relation to Dr. Bivens' statements about children's credibility, Engelby was required to (1) object to Dr. Bivens' statements at the time they were made, or (2) move to strike those statements later, specifically on the ground that they improperly addressed the credibility of child witnesses. Because Engelby did neither, he did not properly preserve his claims, and plain error review applies. See HRE Rule 103(d) (this court may take notice of "plain errors affecting substantial rights" even if "they were not brought to the attention of the court"); see also Addison M. Bowman, Hawai'i Rules of Evidence Manual § 103-4[2] (2018-19 ed.) ("Evidence admitted without any objection . . . is reviewable on appeal only as plain error.").

24

**C.    Under Plain Error Review, Engelby's Substantial Rights Were Not Affected**

Our case law acknowledges that expert psychological testimony in child sexual abuse cases often has the effect of bolstering one witness's credibility at the expense of another's, and that this, on its own, is permissible if it does not unduly prejudice the defendant.  Kony, 138 Hawai'i at 11, 375 P.3d at 1249 (citing State v. Batangan, 71 Haw. 552, 557-58, 799 P.2d 48, 51-52 (1990)).  We have recognized, however, that courts must proceed with caution in admitting this type of testimony.  The testimony may not, for instance, directly opine, or have the same "effect . . . as directly opining on the truthfulness of the complaining witness," as that would usurp the basic function of the jury.  Batangan, 71 Haw. at 559, 799 P.2d at 52 (quoting State v. Myers, 382 N.W.2d 91, 97 (Iowa 1986)) (emphasis added).

It is significant that, here, the State never mentioned Dr. Bivens' challenged testimony in its closing argument.  And, while not dispositive to the issue of bolstering, it is also significant that Dr. Bivens had never met or spoken with any of the case's witnesses, and that he was unfamiliar with the case's details.  Compare State v. McDonnell, 141 Hawai'i 280, 293, 409 P.3d 684, 697 (2017) (holding that Dr. Bivens' statements in that case did not have the effect of

25

directly opining on the complaining witness's veracity, in part, because Dr. Bivens was not familiar with any facts of the case and had not spoken to any of the witnesses) with Batangan, 71 Haw. at 555, 799 P.2d at 50 (holding that the expert witness improperly vouched for the victim's credibility when he testified on the prosecution's behalf after evaluating the complaining witness) and State v. Morris, 72 Haw. 527, 529, 825 P.2d 1051, 1052 (1992) (holding that the expert witness impermissibly bolstered the complaining witness's credibility even though they had never met because the court concluded that the expert's "opinion had to have been based on the child's statements to others").

Additionally, the risk of prejudice to Engelby was reduced by the circuit court's instructions to the jurors on how much weight to give each witness's testimony, and our court's recognition that usurpation of the jury's function can be avoided, in part, with jury instructions. See McDonnell, 141 Hawai'i at 293, 409 P.3d at 697 (citing State v. Sawyer, 88 Hawai'i 325, 329 n.7, 966 P.2d 637, 641 n.7 (1998) (noting that juries are presumed to adhere to a court's instructions)). In McDonnell, for instance, we determined that Dr. Bivens' testimony was not prejudicial, because, inter alia:

> the jury was instructed that they were to decide how much weight to give Dr. Bivens' testimony: "Merely because such a witness has expressed an opinion does not mean . . . that you must accept this opinion. It

26

> is up to you to decide whether to accept this
> testimony and how much weight to give it."

Id. (emphasis added).

It is thus significant that the jury in Engelby's case received the same instruction on weighing credibility as the jury in McDonnell.  See id.  Specifically, the jury was given the following instructions:

> COURT:  During the trial you heard the testimony of one or more witnesses who were described as experts. Training and experience may make a person an expert in a particular field.  The law allows that person to state an opinion about matters in that field.
>
> Merely because a witness has expressed an opinion does not mean, however, that you must accept this opinion.  It is up to you to decide whether to accept this testimony and how much weight to give it.  You must also decide whether the witness's opinions were based on sound reasons, judgment and information.

(emphasis added).

Here, the jury was also presented with ample evidence to independently assess Child's credibility.  In addition to hearing from Child, the jury heard testimony from Child's sister, Child's mother, and Child's mother's boyfriend, all of whom corroborated many aspects of Child's testimony.

Child's sister, for instance, testified that Engelby would come over a lot, sleep over, and sometimes lay down in the bedroom she shared with Child, while Child's mother explained that Engelby was "welcome to come and go as he pleased."  And, although Engelby denied visiting Child's home on the night of the last alleged incident, both Child's mother and her boyfriend

27

testified to the contrary. The mother's boyfriend also testified that he had seen Engelby in Child's room that night, at some time between 12:30 and 2:00 a.m., laying down and illuminated by his cell phone.

Furthermore, Dr. Bivens' testimony was helpful to the jury in understanding aspects of Child's behavior that might otherwise seem inexplicable to a lay juror. In Batangan, we were persuaded that the expert witness had impermissibly bolstered the complaining witness's credibility, in part, because the expert's "testimony regarding general principles of social or behavioral science of a child victim in a sexual abuse case was so minuscule, [that] we [were] convinced that his testimony could not have assisted the jury" in understanding the general dynamics of child sexual assault. 71 Haw. at 562, 799 P.2d at 54 (emphasis added). We continued by explaining:

> In fact, Dr. Bond several times asked the jury to recall their own childhood days and suggested that Complainant's actions were actions of normal children under similar circumstances. When queried about retractions of accusations – a common behavior recognized as unique to intrafamily sex abuse – Dr. Bond admitted that he lacked data on the subject.

Id.

In contrast to the expert witness in Batangan, whose testimony could not be construed as helpful to a jury, here, Dr. Bivens provided extensive testimony about the topics he was explicitly authorized to discuss pursuant to the circuit court's rulings, including the topics of delayed reporting, tunnel

28

memory, and children's reactions to sexual assault events.

Moreover, to the extent Dr. Bivens went beyond those subjects in discussing children's general credibility, he did so only after Engelby inquired about that issue during cross-examination. If Engelby believed Dr. Bivens' answers on cross-examination were non-responsive or otherwise inappropriate, he should have objected and moved to strike those answers. Similarly, when Dr. Bivens responded to additional questions on re-direct examination, Engelby should have objected if he believed the questions or responses exceeded the scope of his cross-examination or were otherwise inappropriate.

## C.    Engelby's Other Claims of Error

With respect to the remaining issues raised by Engelby, we addressed similar issues in State v. McDonnell, a case that was pending before this court at the time Engelby applied for certiorari. 141 Hawai'i 280, 409 P.3d 684. McDonnell involved a defendant who sexually assaulted his minor daughter in their home over a period of several months. See id. We held that Dr. Bivens' testimony on the general dynamics of child sexual assault was admissible because it "helped explain the interaction between [the complaining witness] and [the defendant], and its probative value outweighed its prejudicial effect." Id. at 283, 409 P.3d at 687.

Specifically, we held that Dr. Bivens' testimony on

delayed and incomplete disclosure, tunnel memory, and the general abuse process was relevant; that Dr. Bivens' testimony explaining the behaviors of child sexual assault victims did not usurp the function of the jury or unduly prejudice the defendant; and that Dr. Bivens' testimony on the general process of child sexual assault did not improperly profile the defendant as a child molester. Id. at 290-98, 409 P.3d at 694-702.

In accord with our reasoning in McDonnell, we reject Engelby's other claims of error. Dr. Bivens' testimony – which, as in McDonnell, discussed delayed disclosure, tunnel memory, the general abuse process, and behaviors of child sexual assault victims – was both relevant and helpful to the jury, and neither usurped the function of the jury nor resulted in undue prejudice. Furthermore, although Dr. Bivens' testimony included general quantitative assertions, such as sexual abuse "most often" occurs in a preexisting nonsexual relationship and "most often" in the home of the child or the abuser, such testimony did not improperly profile Engelby as a molester. See McDonnell, 141 Hawai'i at 297, 409 P.3d at 701 (explaining that "Dr. Bivens could have testified generally that abusers are often related to their victims and that such abuse normally occurs in the home").[7]

---

[7] Dr. Bivens' testimony here is therefore distinguishable from his

(continued…)

## V. CONCLUSION

For the foregoing reasons, we affirm the ICA's judgment on appeal, and affirm Engelby's convictions and sentence.

| | |
|---|---|
| Phyllis J. Hironaka<br>for petitioner | /s/ Mark E. Recktenwald |
| | /s/ Paula A. Nakayama |
| Sonja P. McCullen<br>for respondent | /s/ Sabrina S. McKenna |



---

testimony in <u>McDonnell</u>, where he testified that 85 percent of child molesters had a preexisting relationship with the child, and that two studies showed that "100 percent of incest offenders report molesting in their own home." 141 Hawai'i at 297, 409 P.3d at 701. We held that such testimony was unfairly prejudicial to the defendant because it carried the risk of improperly profiling the defendant as a child molester, but that it was harmless in light of the proceedings as a whole. <u>Id.</u> at 297-98, 409 P.3d at 701-02.