Electronically Filed
Supreme Court
SCWC-18-0000548
16-JUN-2020
08:03 AM

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

STATE OF HAWAI'I,
Respondent/Plaintiff-Appellee,

vs.

KEVIN LORA,
Petitioner/Defendant-Appellant.

SCWC-18-0000548

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-18-0000548; CR. NO. 1CPC-17-0000561)

JUNE 16, 2020

McKENNA, POLLACK, AND WILSON, JJ., WITH RECKTENWALD, C.J.,
DISSENTING, WITH WHOM NAKAYAMA, J., JOINS

OPINION OF THE COURT BY POLLACK, J.

The defendant in this case was convicted after a jury trial that turned on the credibility of the complaining witness's testimony. This case raises the issue of whether a portion of that testimony was properly admitted for the purpose of bolstering the credibility of the witness's account of the

incident.  After careful review of the record, we conclude that the adduced testimony was not relevant to the witness's credibility.  Further, we find that the circuit court's erroneous admission of the witness's testimony was highly prejudicial to the defense and not harmless beyond a reasonable doubt.  Additionally, we address the circuit court's consideration of the defendant's request to be sentenced as a young adult in order to review the Intermediate Court of Appeals' interpretation of the relevant statute and to provide guidance in the event the issue arises on remand.

## I.    BACKGROUND

### A. Trial

On May 4, 2017, Kevin Lora was indicted in the Circuit Court of the First Circuit (circuit court) for one count of sexual assault in the first degree in violation of Hawai'i Revised Statutes (HRS) § 707-730(1)(a)[1] and one count of sexual assault in the third degree in violation of HRS § 707-732(1)(f).[2]  The jury trial began on March 19, 2018.[3]

---

[1]    HRS § 707-730(1)(a) (2014) provides as follows:

(1) A person commits the offense of sexual assault in the first degree if:

    (a) The person knowingly subjects another person to an act of sexual penetration by strong compulsion[.]

[2]    HRS § 707-732(1)(f) (2014) provides as follows:

(continued . . .)

The Complaining Witness (CW) testified that she came to Hawaiʻi for a vacation on May 11, 2016, with her sister and a friend, Haley Harlow.  The group stayed at a hotel in Waikīkī together for the duration of their trip.  On Friday, May 13, the group "hiked Koko Head" around midday, which made the CW's legs and back sore.  The next evening, the group had dinner together and then decided to go to an establishment called "Top of Waikiki" to enjoy the view.  While walking there, the group met a man named "Rob."  The four proceeded to Top of Waikiki, where the CW had one glass of wine and one serving of rum.  The group then attempted to enter a nightclub downstairs, the CW testified, but she and Harlow were unable to get in because they were not wearing the proper attire.  Rob remained at the nightclub and the three women decided to go to "Playbar," a different nightclub they had visited earlier in their trip.

Before they entered Playbar, the CW stated, she and her sister had "an awkward exchange," and the CW left the group and returned to their hotel alone.  Once at her hotel room, she

(. . . continued)

>       (1) A person commits the offense of sexual assault in the
>       third degree if:
>
>       . . . .
>
>           (f) The person knowingly, by strong compulsion, has
>           sexual contact with another person or causes another
>           person to have sexual contact with the actor.

[3]     The Honorable Rom A. Trader presided.

changed into a skirt because of the heat. She received text messages from Harlow and her sister asking her to return to Playbar. She also received a text message from Rob, with whom she had exchanged numbers at Top of Waikiki. Rob asked if she was staying in for the rest of the evening, and the CW responded that she was but the other two women were at Playbar. Rob asked if she would like to go back to Playbar together, and the CW agreed to do so. The two met up and walked to Playbar together, where they rejoined Harlow and the CW's sister. The CW believed that they arrived at Playbar between 9:30 and 10:00 p.m., but she was not certain.

Around 11:00 p.m., the CW testified, her sister left Playbar and returned to the hotel. Harlow and the CW remained there together until around 1:30 or 2:00 a.m. when Harlow also returned to the hotel. The CW stated that she remained at Playbar until around 2:30 a.m. at which time she left to return to her hotel. She had six servings of alcohol while at Playbar. She was feeling "a little dizzy" as she left but attributed her physical condition to the change in environment between the nightclub and the street. The CW said that she was not feeling drunk at that time.

Harlow testified that after she left Playbar around 1:30 a.m., she met a man on the street who came up to her and introduced himself as Dominick. At trial, Harlow identified

4

Lora as the man she met that night. She stated that Lora walked her back to her hotel where they exchanged phone numbers. After she returned to her hotel room, Harlow testified, the two conversed for a while through text messages. Harlow asked if Lora would come back to her hotel and walk with her to the water, and Lora agreed to do so. The two met up, walked to the beach, and sat on the sand by the water. They talked for a while and then started to kiss. Harlow testified that Lora wanted to go further, but she told him she was not interested in doing so. Lora said that he respected that, and they continued talking. Soon after, they were approached by a police officer who told them the beach was closed. They then returned to Harlow's hotel and parted ways near the lobby. Harlow stated that after returning to her room, she exchanged further text messages with Lora. Following the text message conversation, which began at 3:03 a.m. and involved only a few messages, Harlow fell asleep.

The CW testified that as she was returning to her hotel from Playbar, she was approached just outside her hotel by a man who introduced himself as Dominick. The CW identified Lora at trial as the same man. After briefly engaging in small talk, Lora asked the CW if she wanted to walk on the beach with him. The CW stated that she showed Lora her ring and told him

she was married and not interested.[4]  According to the CW, Lora put his left arm around her back so they were standing close together and reached across and pushed his right thumb into her arm very hard.  He then told the CW that they were going for a walk on the beach.  They began walking toward the beach, the CW testified, and Lora maintained a tight grip on her arms and shirt as they walked, which caused the seams of her shirt to rip.  The CW stated that she became fearful and "felt very frozen."  At some point during the walk, the CW stated, Lora shifted his grip on her and grasped the side of her neck.  As they neared the beach, the CW testified, she began to physically struggle against Lora and tried to throw her body weight to the ground.[5]  She stayed on her feet, however, and did not fall.

When they arrived at the beach, she stepped off the two-foot tall seawall onto the shore to try to create distance between them.  Lora removed his pants and shoes and followed her onto the beach.  The CW stated that she was standing with her back facing the seawall and Lora was in front of her.  The CW said that Lora then grabbed her hand and placed it on his penis over his underwear.  At this point, the CW testified, she raised

---

[4]     The CW testified that she was engaged at the time of her trip.

[5]     The CW testified that on May 15, 2016, she was 5'2" and weighed around 238 pounds.  She described Lora as being barely taller than her and believed that she outweighed him because he was physically smaller than her.

her voice and began to yell and plead with him.  Lora asked her, "So are you going to go down on me now, or should I force you?" The CW testified that she was pressed against the seawall, which was digging into her lower back, and Lora was in front of her. The CW said that she attempted to move away from him and ended up lying on her back in the sand on the same level as the seawall.  He held her down by her arms and ripped her shirt in an attempt to expose her right breast.  The CW stated that while she was struggling Lora's saliva got on her chest.  Lora was pressing down on her arms on the insides of her biceps, the CW stated, and he was gripping her so tight that she lost feeling in her hands.  She related that it felt like "he was digging a knife into my arms"; she was telling him to please stop and that she did not want to do this.  The CW testified that Lora then pushed up her skirt and penetrated her vagina with his penis. The CW stated that she struggled at first and then went limp. During the struggle, the CW testified, she yelled and called out hoping that someone might hear her.  The CW also stated that Lora headbutted her in the forehead during the struggle.  He eventually stopped, the CW stated, and she believed that he had ejaculated.  After Lora finished, he gathered his clothes and sprinted away.

The CW testified that she immediately left the beach and made her way back to the street.  She collapsed on the

ground near a crosswalk and began to cry and call out for help. A man approached her and asked if she was okay, and she told him, "No, I'm not okay, I've just been raped." The man helped her get to a nearby police station, which was in sight of where she had collapsed on the ground.

The man, Larry Macri, testified that he was working at a restaurant in Waikīkī at that time. Macri stated that he got off work sometime after 1:00 a.m. on May 15, 2016. He had missed the last bus because he got off work late, so he decided to wait at a bench in that area until 4:15 a.m. when the buses would start running again. While he was sitting at the bench, Macri saw the CW, who was about fifty feet away, walk from the beach toward the crosswalk. The CW was crying and appeared distraught, so he approached her. Macri testified that the CW's clothes appeared to be intact, and she was wearing pants. Macri helped the CW reach the police station and subsequently gave a written statement to a police officer around 4:25 in the morning. Macri stated that from where he was sitting on the bench, he "absolutely" would have heard any screaming or yelling coming from the area of the beach that the CW had come from, but he did not hear screaming or yelling at any time.

Honolulu Police Department (HPD) Officer Jon Kawana testified that he was working at the Waikīkī substation on May 15, 2016. The CW came into the substation around 3:21 a.m.,

accompanied by Macri.  Officer Kawana took the CW's statement and prepared a written report.  In the report, Officer Kawana observed that the CW was wearing a shirt and black and white pants.  HPD Officer Leslie Garner was also working at the Waikīkī substation at that time.  Officer Garner testified that officers called for an ambulance to treat the CW immediately on-site based on the statement she gave.  The CW refused to be treated at first, but she ultimately agreed to be taken to the hospital.  Officer Garner stated that she took the CW to the hospital at 4:21 a.m.

The CW testified that after being taken to the hospital, she was examined by a male doctor.  She identified several photographs as being accurate depictions of her at that time.  The photographs, which were introduced into evidence, depicted the CW wearing a long tank-top shirt and black and white pants.  The photographs did not depict any damage to the CW's clothes.

The deputy prosecuting attorney (DPA) asked the CW, "What was it like to get examined by [a] male doctor?"  Defense counsel objected on relevancy grounds, and the objection was overruled.  The CW began to answer, stating as follows: "It was -- the process of what you go through when you come in like this is very dehumanizing.  Um, you're -- you're standing there in your ripped clothes and --."  Defense counsel objected again

that the testimony was irrelevant and asked to approach. At the bench, the DPA argued that what occurred during the exam, her emotional state, and her ability to relate to the doctor and give him an accurate medical history were all relevant to the case. The court overruled the objection. The CW proceeded to answer the question as follows:

> Um, the process of a rape collection kit is very dehumanizing. Um, after experiencing the trauma that I had just gone through, I had to stand on a mat and carefully remove all of the clothing that I had on, and I could see all the sand falling onto this mat.
> And I had to stand naked in exam room lighting, just completely naked, while someone took pictures of me. I was given a gown and a sheet, and I waited for the doctor to arrive.
> He explained to me in probably the most compassionate way that he can that a lot of this will be violating, and he apologized upfront for the process.
> There were, like, a lot of swabs that were taken from parts of my body where I know that his saliva had been.
> There was a vaginal exam, and it's not the kind like you go to the doctor and have one done. It's, like, a very long time with a man looking at me and taking high def pictures of my most personal areas. It was horrible.

The DPA then asked the CW how long she was at the hospital. The CW responded as follows:

> I was there until 10:00 the next morning. I had to receive prophylactic injections in case that the defendant had diseases.

> I took a pregnancy test. I was given oral anti-virals to make sure that I didn't contract hepatitis or HIV, and so for every morning and every night for the next 30 days, I took a pill that made me extremely sick. It's better than getting hepatitis, I guess.

The DPA then asked the CW, "When you look back at this night, . . . is there anything that you wish you did differently?" Defense counsel again objected on relevancy grounds and the objection was overruled. The CW answered as follows:

> I have spent two years thinking and pondering of what could have happened differently that night for me, and when I first started, my regrets were, I reg[r]et wearing a skirt. I reg[r]et shaking his hand. I reg[r]et not being able to feel fear and act on it in a way that would protect me.
> And as I've -- as I've grown in my progress, in my healing --

The defense objected for the fourth time on relevancy grounds and the court sustained the objection.

On cross-examination, the CW acknowledged that during a police interview with HPD Detective (Det.) David Yamamoto on Sunday, May 15, she did not mention the glass of wine that she had at Top of Waikiki when she was asked about how much alcohol she had consumed that evening. She stated that she had forgotten about the wine at that time and didn't realize she had purchased a glass of wine that night until she reviewed her credit card statement sometime after she returned home. The CW also admitted that, when asked about how many drinks she had that night during the grand jury proceedings, she had not informed the grand jury about either of the drinks she consumed at Top of Waikiki that evening.[6]

Doctor (Dr.) Wayne Lee testified that he conducted the CW's sexual assault examination at the hospital on the morning

---

[6] On redirect examination, the DPA asked the CW what her mental state was like during her interview with Det. Yamamoto. The CW stated that she was very tired and scared. The DPA asked if she intentionally left anything out of her statement to Det. Yamamoto, and the CW responded that she did not. The DPA next asked the CW what the grand jury proceeding was like. The CW stated that the questions were much more direct and simple, and she was not asked to give as many details as she was during the trial.

of May 15, 2016.[7]  A sexual assault examination begins with a historical examination, which involves talking with the patient and asking them questions about their complaint and why they came to be examined.  During the historical examination, the CW related that she had consumed five drinks prior to the incident.  Dr. Lee then conducted the physical examination.  He found tenderness on the back of the CW's head, a faint contusion on her lower back, bruises on her lower extremities, and lacerations near her vaginal entrance.  He took swabs of areas where the CW stated that DNA might be found, including from her breasts.  Dr. Lee did not observe any injuries on the CW's shoulders, arms, forehead, or neck and did not observe any bruises, thumb prints, or other contusions.  Dr. Lee testified that if a person's neck and arms had been tightly gripped, he would expect to see marks or redness in those areas.  Similarly, he would expect to see some sort of mark on the forehead if a person was headbutted there.  Dr. Lee also testified that the lacerations on the CW's genitalia were equally consistent with consensual sex and non-consensual sex.

---

[7]     Dr. Lee testified that he graduated from the University of Hawai'i Manoa in 1970 with a bachelor's degree in zoology and from the University of Texas Medical School, San Antonio, in 1974 with a medical degree.  The court found Dr. Lee to be qualified as an expert in the field of medicine, with further experience in the examination and treatment of patients who present complaints of alleged sexual assault.

HPD criminalist Michelle Amorin, an expert in serology and forensic DNA testing, testified that she compared swabs collected from the CW's body during her examination against a buccal sample collected from Lora.  Amorin testified that sperm cells were recovered from the samples taken from the CW's vagina, and she was able to develop a full DNA profile for the contributor of the sperm.  Amorin stated that she compared that DNA profile to Lora's profile and excluded him as a source of the sperm cells that were recovered during the CW's sexual assault examination.  Amorin also analyzed a sample collected from the CW's right breast and stated that it matched Lora's profile, with the probability of a false match greater than one in eight trillion.

HPD Officer Tricenn Rivera testified that he checked the Waikīkī Hyatt hotel (Hyatt) for surveillance video that might have shown the CW around the time of the incident based on her description of her walk with Lora.  Officer Rivera stated that he was able to view security footage of the area for the relevant time frame, but that the video was not recovered at that time because the person authorized to release the footage was not available.  Officer Rivera testified to what he saw on the video:

> [Rivera:] At [a] certain time[, I] was able to identify the complainant and a male walk towards the beach, and after a few moments, we see the male running northward up the same

13

street, and a few minutes later, we see the female emerge from the beach area onto the sidewalk.

[DPA:] And you say a few moments.  When you first see them walking, when you see them leaving, are you saying it happens in a few moments?

[Rivera:] It's actually more than a couple minutes

. . . .

[DPA:] And what could you see about their body positions during the first portion of the video that you watched?

[Rivera:] So as they're walking towards the beach on Uluniu Ave, they're walking together, they're abreast toward the beach, and they're engaged in conversation.

[DPA:] And when you see the next relevant portion, it's only the male wearing similar clothing?

[Rivera:] Correct, and he's running.  He's actually sprinting up Uluniu Avenue by himself.

[DPA:] And you also see [the CW] reappear in that surveillance video?

[Rivera:] Correct.  She emerges from the sidewalk area right here, and she appears to be flag --

[DPA:] Mm-hm.

[Rivera:] She appears to be flagging down a passerbyer.

The officer identified the CW in the footage, but he could not positively identify the man she was with.  The man's clothes and build appeared consistent with the description given to him by the CW.  Officer Rivera testified that, based on the security footage, the man did not appear to be forcing the CW towards the beach.  At no point did the CW turn around or pull away, and she did not appear in distress.  He stated that it didn't appear that "anything was wrong with these two people."

Det. Yamamoto testified that he was the detective assigned to investigate the CW's complaint.  He stated that he

first went to the hospital to meet with the CW before investigating the scene. He was not personally involved with securing the scene because it had been secured by patrol officers before he arrived. Toy Stech, a technician with the Scientific Investigation Section of the HPD, took photographs and collected evidence from the scene. Stech used an alternate light source to look for biological evidence at the scene, but none was recovered.

Det. Yamamoto testified that during the course of his investigation, he learned that there was a security video that was pertinent to the investigation. He initially believed the video had been retrieved by another officer, but on July 6, 2017, he discovered that the HPD was not in possession of the video. He contacted the Hyatt at that time but was unable to retrieve the video. The detective explained that he believed the video had already been recovered because he recalled being shown the video by another officer. Det. Yamamoto stated that he just remembered seeing a video of two people walking and that it didn't show anything in particular. There were no identifying features and he could not tell what the two people were wearing. He did not recall seeing a man sprinting away from the scene and stated that if he had, such information would have been noted in his closing report.

Det. Yamamoto also testified that he ordered the DNA testing of the swabs collected from the CW during her examination. Sometime after the tests were conducted, he learned that some of the swabs contained semen and that Lora was excluded as the source. After learning this information, he did not take any additional investigative steps or attempt to contact the CW. The detective maintained that although he was aware of the information, the official report was not completed before his retirement. He did not know if any other HPD personnel had taken investigative action based on the results of the DNA tests.

Mitch Johnson, director of security at the Hyatt, testified that their security video recordings are kept for thirty days before being deleted. He stated that he had responded to requests for security footage from the HPD in the past and described the procedure that had been established for many years. The HPD did not request the security video from the hotel until July 6, 2017.

During closing argument, the DPA stated "Can you believe [the CW]? Yes. . . . Because [the CW] was candid, because she was authentic, because she was detailed, and because she was supported by the evidence." The DPA pointed to the fact that "[The CW] told you about the humiliation that she felt when she endured the sexual assault exam, of being stripped of her

clothes, being photographed like a specimen, being poked and prodded by a strange male she had never met before that night." The DPA continued:

> Now, [the CW] was also believable because she was consistent. [The CW] was completely candid in the way that she testified to everything, the things that made her look bad, the things that were embarrassing to her, all of her regrets, and the days and weeks and months of wishing that she did things differently, that's the self-blame. That's the self-blame that you saw right in front of you these past few days.

Near the end of argument, the DPA stated that the evidence in the case "is [the CW], the rest of it is just there to support or not support. And [the CW]'s testimony, as the jury instructions tell you, by itself can prove guilt."

Defense counsel argued during closing argument that the CW's account was not credible. Numerous inconsistencies between the CW's account and the evidence adduced at trial undermined the credibility of the CW's assault allegation, counsel argued. These included the inconsistencies between what the CW stated she was wearing and what Macri and Officer Kawana observed, the lack of evidence that her clothing was ripped or damaged, the inconsistency between her description of how Lora forced her down the street and what Officer Rivera and Det. Yamamoto observed on the surveillance video, and the inconsistency between the marks Dr. Lee observed during his examination of the CW and the marks that he stated he would expect to see based on the CW's account. Counsel also noted the

inconsistency between the number of drinks the CW reported

consuming to Dr. Lee and her testimony at trial.

The DPA argued on rebuttal that even though "people

aren't going to get why [she] didn't run," the CW "still went

through all of this."  The DPA continued, stating that:

> [The CW] still went through that sexual assault exam.  She
> still endured having to take medication for weeks.  She
> still endured having to fly to Hawaii twice, take time out
> of her life to sit there, relive her assault and be
> attacked for every decision that she made and every action
> she did or didn't do.  She went through all of that with
> absolutely nothing to gain.

## B. Sentencing

The jury found Lora guilty on both counts.  Lora

requested, and the State opposed, that he be sentenced as a

young adult defendant pursuant to HRS § 706-667.[8]  At the

_____

[8]     HRS § 706-667 (2014) provides in relevant part as follows:

(1) Defined.  A young adult defendant is a person convicted
of a crime who, at the time of the offense, is less than
twenty-two years of age and who has not been previously
convicted of a felony as an adult or adjudicated as a
juvenile for an offense that would have constituted a
felony had the young adult defendant been an adult.

. . . .

(3) Special Term.  A young adult defendant convicted of a
felony, in lieu of any other sentence of imprisonment
authorized by this chapter, may be sentenced to a special
indeterminate term of imprisonment if the court is of the
opinion that such special term is adequate for the young
adult defendant's correction and rehabilitation and will
not jeopardize the protection of the public.  When ordering
a special indeterminate term of imprisonment, the court
shall impose the maximum length of imprisonment, which
shall be eight years for a class A felony, five years for a
class B felony, and four years for a class C felony.  The
minimum length of imprisonment shall be set by the Hawaii
paroling authority in accordance with section 706-669.
During this special indeterminate term, the young adult

(continued . . .)

sentencing hearing, Lora presented statements from family members and himself to argue that he fit HRS § 706-667's age requirement, was in the military, had no prior arrests or convictions, and had the love and support of the community. The circuit court stated that it was "a terribly sad day for all concerned." The court noted that the CW's life had been "forever changed by what happened that night" and that this was "a violent, horrific act." The court recognized that Lora "vehemently disagree[d]" with the jury's verdict and it was clear to the court that Lora had the love and support of many in the community. The court further noted that Lora had served in the military, engaged in community service, and was married and expecting his first child. However, the court stated, Lora had taken advantage of the CW and expected to get away with it because he was "bigger, badder, stronger." "You're a Marine," the court stated. "You take care of business, and [the CW] was no match for you." The court then stated as follows:

> [O]ne of th[e] options that [defense counsel] is asking the Court to consider is that of youthful offender. I think you technically meet the requirements.
> But I divide the world into basically two camps. I sentence people every single week. That's probably the most important decision that judges make. And I separate the world in two: Those people that are violent, and those people that aren't.

---

(. . . continued)

> shall be incarcerated separately from career criminals, when practicable.

19

> And in this particular instance, while [defense counsel] has done his best and everybody who cares about you has tried to have the Court focus in on your good qualities -- and you have them.  But when people are watching, it is easy to do the right thing.  But when you don't think people are watching, people do things that no one would expect them to do.  And in this particular case, that is exactly what the Court thinks you did.  It may not typify how you've lived the rest of your life.
>
> But in an instant, you chose to get out there, trying to meet some girls, trying to get some action, or whatever you want to call it, and you preyed upon this woman.  And you treated her like a piece of garbage, and you left her there on the beach to try to pull together the pieces.  And unfortunately, that has blown back on you.
>
> So, Mr. Lora, I give you tremendous credit for being here today.  I worry.  I don't know sometimes when I have people released on status whether they're going to show up, especially when they're looking at a sentence like this.  But it's to your credit.  All right.
>
> But now's the time where the consequences have to be imposed.  And for you, Mr. Lora, I am going to deny the request for youthful offender sentencing, not that you don't meet the age and other requirements, but I don't believe that a special term is appropriate in your situation.

(Emphases added.)

Lora was sentenced to an indeterminate term of twenty years of imprisonment on the sexual assault in the first degree offense and five years of imprisonment on the sexual assault in the third degree offense with the sentences to run concurrently.  The Judgment of Conviction and Sentence (circuit court judgment) was entered on June 12, 2018.

## II.  ICA PROCEEDINGS

Lora appealed from the judgment to the Intermediate Court of Appeals (ICA), arguing that the circuit court committed five separate errors that required either resentencing or a new trial.  First, Lora argued that the court abused its discretion by "refusing to sentence Lora as a youthful offender."  Second,

Lora maintained that the court erred in overruling defense counsel's relevancy objections to the CW's testimony about her examination by Dr. Lee and what she wished she had done differently, and additionally that the court's failure to exclude the evidence under Hawai'i Rules of Evidence (HRE) Rule 403 was plainly erroneous.[9] Third, Lora argued that the circuit court committed plain error by permitting testimony about the contents of the security video that had not been recovered. Fourth, Lora maintained that the State committed prosecutorial misconduct in its opening statement, closing argument, and rebuttal argument. Finally, Lora contended that the cumulative effect of these errors required a new trial.

In a summary disposition order entered on August 30, 2019, the ICA affirmed the circuit court judgment.[10] The ICA determined that the circuit court did not abuse its discretion in sentencing Lora. The ICA stated that the circuit court's "division of offenses into 'two camps' based on the use of violence reflects the circuit court's consideration of the 'protection of the public,' as required in HRS § 706-667(3)."

_____

[9] HRE Rule 403 (2016) provides as follows: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

[10] The ICA's summary disposition order can be found at State v. Lora, No. CAAP-18-0000548, 2019 WL 4132682 (App. Aug. 30, 2019) (SDO).

With respect to the CW's testimony about the examination, the ICA concluded that it was "relevant evidence for the jury to consider in assessing" her credibility, providing potential explanations for her inconsistent testimony and "undermin[ing] defense counsel's portrayal of [the] CW as a liar." The ICA exercised plain error review to consider whether the evidence should have been excluded under HRE Rule 403 and concluded that the circuit court did not err in permitting the CW's testimony. The ICA determined that the CW's testimony about her "regrets" was irrelevant, which the State had essentially conceded. But the ICA concluded that the admission of the testimony was inconsequential because the "CW's statements regarding her regrets were brief" and "neither the State nor defense counsel emphasized it or further referred to it in closing arguments." Accordingly, the ICA concluded that the error was harmless beyond a reasonable doubt.

The ICA further determined that the testimony about the security video was not erroneously admitted, and while the DPA made argumentative remarks during opening statement, there was no misconduct during closing argument or rebuttal and the improper argument was harmless beyond a reasonable doubt. The ICA also concluded that although the introduction of the irrelevant evidence about the CW's regrets was erroneous and there was some improper argument during the State's opening

statement, these errors were insubstantial, and thus there was no need to consider their cumulative effect.

Lora timely sought certiorari review of the ICA's Judgment on Appeal, contending that the ICA erred in its rulings on the points of error raised in his appeal.

### III.    STANDARDS OF REVIEW

#### A.    Relevance

"We apply the right/wrong standard in reviewing challenges to a court's relevancy decision[.]" State v. Kony, 138 Hawai'i 1, 8, 375 P.3d 1239, 1246 (2016).

#### B.    Sentencing

"[A] sentencing judge generally has broad discretion in imposing a sentence.  The applicable standard of review for sentencing or resentencing matters is whether the court committed plain and manifest abuse of discretion in its decision." State v. Kahapea, 111 Hawai'i 267, 278, 141 P.3d 440, 451 (2006) (alteration in original) (citations omitted).  A court abuses its discretion if it has clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant. Amfac, Inc. v. Waikiki Beachcomber Inv. Co., 74 Haw. 85, 114, 839 P.2d 10, 26 (1992) (citing State v. Akina, 73 Haw. 75, 78, 828 P.2d 269, 271 (1992)).

## IV. DISCUSSION

### A. The Admission of the CW's Challenged Testimony Was Not Harmless Error.

#### 1. The Challenged Testimony Was Not Relevant to the CW's Credibility.

Evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. HRE Rule 401 (2016). In this case the State argued, and the ICA concluded, that the CW's response to the question "What was it like to be examined by a male doctor?" was relevant to her credibility. The ICA emphasized that defense counsel elicited testimony as to how many drinks the CW reported consuming that evening to Dr. Lee and that counsel noted in closing argument the inconsistency between the amount the CW stated to Dr. Lee, police, the grand jury, and her testimony at trial. In conclusion, the ICA held that the CW's "emotional state during the post-assault examination provided a possible explanation for the inconsistencies and was thus relevant . . . to support CW's credibility."

It appears the ICA assumed that the testimony regarding the physical examination was probative of the CW's emotional state at the time she reported the number of drinks that she consumed to Dr. Lee, and thus it was relevant to the

24

credibility of her statements to Dr. Lee. Preliminarily, we note that the CW reported the number of drinks she consumed that evening to Dr. Lee during the historical examination, which occurred <u>before</u> she underwent the physical examination. Thus, any emotional disturbance caused by the physical examination could not have affected the credibility of statements the CW made during the historical examination. The nature of the CW's physical examination and the effect that undergoing it had on her emotional state was therefore irrelevant to the credibility of statements that the CW made during the historical examination.

Significantly, the challenged testimony also does not describe the CW's emotional state during the historical examination. The question was framed as an inquiry about the physical examination: "What was it like to get examined by [a] male doctor?" Accordingly, the question prompted the CW to extensively describe the process she went through when undergoing the physical examination.[11] Similarly, the follow-up

_____

[11]    The CW's response, as stated, was as follows:

    Um, the process of a rape collection kit is very dehumanizing. Um, after experiencing the trauma that I had just gone through, I had to stand on a mat and carefully remove all of the clothing that I had on, and I could see all the sand falling onto this mat.
    And I had to stand naked in exam room lighting, just completely naked, while someone took pictures of me. I was given a gown and a sheet, and I waited for the doctor to arrive.

(continued . . .)

question by the DPA again went solely to the physical examination: "And how long were you there?" The CW's response described not only the length of time the CW was at the hospital, but also the injections and medication given while she was there and her reactions to medication over the following month.[12] The emotional effect of the physical examination was therefore irrelevant because it could not have affected the veracity of statements that were made prior to the physical examination. Since the challenged testimony was not probative of the CW's emotional state during the historical examination, it had no bearing on her credibility at the time that the statements in question were made to Dr. Lee and cannot be relevant on that basis. Thus, the detailed testimony about the

---

(. . . continued)

> He explained to me in probably the most compassionate way that he can that a lot of this will be violating, and he apologized upfront for the process.
> There were, like, a lot of swabs that were taken from parts of my body where I know that his saliva had been.
> There was a vaginal exam, and it's not the kind like you go to the doctor and have one done. It's, like, a very long time with a man looking at me and taking high def pictures of my most personal areas. It was horrible.

[12] As stated above, the CW's full response was as follows:

> I was there until 10:00 the next morning. I had to receive prophylactic injections in case that the defendant had diseases.
> I took a pregnancy test. I was given oral anti-virals to make sure that I didn't contract hepatitis or HIV, and so for every morning and every night for the next 30 days, I took a pill that made me extremely sick. It's better than getting hepatitis, I guess.

physical examination was improperly admitted by the court.[13] Accordingly, the circuit court and the ICA erred in concluding that this testimony was relevant to the credibility of statements the CW made during the historical examination.

Contrary to the State's contention that the challenged testimony was relevant to the credibility of the CW's statements to Dr. Lee, the dissenting opinion (dissent) argues that the challenged testimony was probative of the CW's mental state during her interview with Det. Yamamoto the following evening. Dissent at 2-3. This position, which the State has never taken during the proceedings of this case, is not supported by the CW's own testimony that explained why certain statements made to Det. Yamamoto were inconsistent with her testimony at trial. Additionally, the record does not indicate that the CW ever referred to the physical examination during the interview or indicated that its effects impacted her ability to appropriately

_____

[13] It is noted that during the redirect examination of the CW, the DPA specifically asked what her state of mind was during her interview with Det. Yamamoto so that she could explain to the jury why she may have had difficulty with the precise details in her statement. The reasons given by the CW did not relate to the physical examination. The DPA also specifically elicited testimony from the CW explaining why her testimony to the grand jury did not contain all the details that she testified to at trial. The DPA did not elicit similar testimony with respect to the CW's mental state during the historical examination. Even assuming the CW was in an emotional state from the incident during the historical examination, this condition would not provide a basis for admitting evidence of her emotional reactions to the physical examination that subsequently occurred.

respond to the detective's questions. The dissent's contention is consequentially unsupported by the record.

The dissent also makes the argument that because the defense maintained that the CW was not truthful in her account of the incident, the State was permitted to elicit the detailed testimony regarding the physical examination. Dissent at 3-4. The ICA similarly concluded that the challenged testimony "provided relevant evidence for the jury to infer possible reasons for a person to voluntarily undergo the examination." However, the CW's reasons for undergoing the examination were irrelevant to the issues in the case. The nature of the physical examination, its length, the manner in which it was conducted, and medication taken afterwards were likewise not relevant to the CW's account of the incident. The ICA's and dissent's analyses indicate that whenever there is a physical examination of a complainant following an allegation of a sexual assault, the complainant is permitted to provide a detailed explanation of the examination and any subsequent treatment received if the complainant's version of the events is impeached by evidence or is challenged in opening statement or closing argument. Thus, although the testimony regarding the physical examination was not otherwise relevant to the issues at trial, the ICA and the dissent would hold that it was admissible to prove why the complainant underwent the examination or as a

28

means to bolster the general credibility of the complainant's allegation. We do not agree that these reasons are proper bases for the admission of the testimony regarding the physical examination in this case. We reject an approach that would permit the admissibility of the impacts of an alleged offense on a complaining witness in order to bolster the witness's credibility after it has been impeached or attacked.[14]

Additionally, the DPA was erroneously permitted to introduce other irrelevant testimony. The DPA asked the CW, "When you look back at this night, . . . is there anything that you wish you did differently?" Defense counsel objected on relevancy grounds and was again overruled.[15] The State has

---

[14] The dissent cites cases from other jurisdictions to support its contention that the CW in this case could testify to the details of the medical examination to bolster her credibility after it had been challenged by the defense. Dissent at 4. Numerous cases have held otherwise, and the general rule is to the contrary. See Kimberly J. Winbush, Admissibility of Victim Impact Evidence in Noncapital State Proceedings, 8 A.L.R. 7th Art. 6 (2016) (stating that impact evidence is "generally considered irrelevant if offered during the guilt phase of a trial unless relevant to a proper purpose, such as to impeach a victim's credibility or establish an element of the crime at issue").

In any event, this court has never held that the complainant or another witness may testify about the impact of an alleged offense merely to bolster the credibility of a complainant whose credibility has been impeached, nor do we endorse this proposition.

[15] The CW testified as follows:

I have spent two years thinking and pondering of what could have happened differently that night for me, and when I first started, my regrets were, I reg[r]et wearing a skirt. I reg[r]et shaking his hand. I reg[r]et not being able to feel fear and act on it in a way that would protect me. And as I've -- as I've grown in my progress, in my healing --

implicitly conceded on appeal that this testimony was irrelevant, and there is no dispute that the testimony was improperly admitted into evidence. Thus, although the ICA correctly determined that it was error to admit the CW's testimony about what she wished she had done differently, the ICA erred in holding that the CW's testimony about the physical examination was properly admitted.[16]

## 2.    The Errors Were Not Harmless Beyond a Reasonable Doubt.

Once it has been determined that testimony was erroneously admitted into evidence, the appellate court must consider whether the erroneous admission was harmless beyond a reasonable doubt. State v. McCrory, 104 Hawai'i 203, 210, 87 P.3d 275, 282 (2004) (quoting State v. Gano, 92 Hawai'i 161, 176, 988 P.2d 1153, 1168 (1999)). Errors must be considered in light of the entire proceedings, and if there is a reasonable possibility that an error might have contributed to the conviction, then it is not harmless beyond a reasonable doubt. Id.

In this case, the CW was erroneously permitted to testify about what it was like to undergo the physical examination and about what she wished she had done differently.

---

[16]    The ICA also considered whether the challenged testimony should have been excluded under HRE Rule 403 and concluded that its admission did not constitute plain error. While it is unnecessary to address this issue, we do not agree with the ICA's analysis.

This court considered the prejudicial effect of similarly irrelevant testimony in State v. Uyesugi, 100 Hawai'i 442, 60 P.3d 843 (2002).

In Uyesugi, the defendant was charged for the shooting deaths of several individuals. Id. at 446, 60 P.3d at 847. The prosecution adduced testimony about the victims' backgrounds from family members. Id. at 448, 60 P.3d at 849. On appeal, this court stated that the admission of the evidence was likely prejudicial to defendant but did not constitute plain error. Id. at 460-461, 60 P.3d at 861-862. We noted that defense counsel objected to only a single question involving the evidence and there was no reference to the testimony by the prosecutor during closing argument. Id. Additionally, the overwhelming evidence of guilt led the Uyesugi court to conclude that while the admission of the testimony from family members may have been error, it did not affect the defendant's substantial rights and therefore did not rise to the level of plain error. Id. at 462, 60 P.3d at 863.

In contrast, defense counsel in this case immediately objected to the first improper question as being irrelevant and was overruled. Counsel objected again during the course of the CW's answer and requested a bench conference. The objection was again overruled, and the CW was permitted to provide an extensive answer that detailed the process of the physical

31

examination.  The subsequent question, wherein the DPA asked the CW if there was "anything that you wish you did differently?" was also immediately objected to and overruled.  Subsequently, the DPA referred to the improperly admitted testimony about the physical examination and the CW's regrets during closing and rebuttal arguments and specifically asserted that it bolstered the credibility of the CW's sexual assault allegation.[17]  The DPA's use of this evidence as a means to bolster the overall credibility of the CW's allegation was clearly improper and highly prejudicial to the defense.

The CW's testimony about the details of the "dehumanizing" and "horrible" nature of the physical examination she underwent, "taking high def pictures of [her] most personal areas," the injections and medication she was given, and her reactions to the medication over the following month very likely created sympathy for the CW and negative feelings against Lora. See HRE Rule 403 cmt. (stating that evidence may be prejudicial

---

[17]     The DPA recounted the following testimony during closing argument: "[The CW] told you about the humiliation that she felt when she endured the sexual assault exam, of being stripped of her clothes, being photographed like a specimen, being poked and prodded by a strange male she had never met before that night."  The DPA relied on the other erroneously admitted testimony as well, arguing that "[the CW] was completely candid in the way that she testified to everything, the things that made her look bad, the things that were embarrassing to her, all of her regrets, and the days and weeks and months of wishing that she did things differently, that's the self-blame."  During rebuttal argument, the DPA again relied on the CW's testimony about the physical examination, arguing as follows: "[The CW] still went through that sexual assault exam.  She still endured having to take medication for weeks."

if it engenders juror prejudice, hostility, or sympathy). The CW's testimony about what she wished she had done differently was similarly inclined to provoke sympathy for the CW and hostility toward Lora.

It is clear that the erroneously admitted testimony was presented in such a way as to cause the jury to believe it was appropriate for their consideration when determining Lora's guilt. Uyesugi, 100 Hawai'i at 461-62, 60 P.3d at 862-63. The admission of this testimony, the manner in which it was presented by the DPA, and the reliance upon it during closing argument all demonstrate that this error was highly prejudicial. See id.

Turning to the record as a whole, this is distinctly not a case where there is a "wealth of overwhelming and compelling evidence tending to show the defendant guilty beyond a reasonable doubt." State v. Rivera, 62 Haw. 120, 128, 612 P.2d 526, 532 (1980). As the DPA stated in closing argument, the evidence of Lora's guilt "is the CW," all the other evidence merely supported or undermined her testimony. The jury's verdict rested on it accepting the CW's account as true, and the

erroneously admitted testimony was specifically used to bolster the credibility of her account.[18]

In cases when a defendant's conviction turns on a jury's determination as to credibility, the potential for prejudice is "particularly evident" where the error concerned the credibility of the testimony of the witness on which the case turned; in such circumstances we have held that the error is not harmless beyond a reasonable doubt.  See State v. Underwood, 142 Hawai‘i 317, 329, 418 P.3d 658, 670 (2018) ("When a conviction is largely dependent on a jury's determination as to the credibility of a complainant's testimony, we have held that the evidence of the offense is not so 'overwhelming' that it renders the prosecutor's improper statements harmless beyond a reasonable doubt."); see also State v. Pacheco, 96 Hawai‘i 83, 97, 26 P.3d 572, 586 (2001) (holding that the prosecutor's improper attack on the defendant's credibility during closing argument was not harmless when guilt turned on the credibility

_____

[18]    The dissent acknowledges that the CW's testimony was central to the State's case, but it contends that the corroborating evidence demonstrates the admission of the challenged testimony was harmless.  Dissent at 5-7.  However, several portions of the CW's account of the incident were not corroborated by other evidence in the record.  For example, the CW's description at trial of Lora's use of physical force was inconsistent with Dr. Lee's expert opinion that visible marks would have been left on her body from many of the actions she attributed to Lora, which the doctor stated that he did not observe and would have expected to see during the physical examination.  The CW's description of the forceful manner in which she and Lora walked from her hotel to the beach was inconsistent with the testimonies of Officer Rivera and Det. Yamamoto as to what the security footage showed.  There were also additional inconsistencies regarding the clothing worn during the incident and the description of the CW's shirt being ripped.

of the defendant's testimony); State v. Pitts, 146 Hawai'i 120, 133, 456 P.3d 484, 497 (2019) (holding that error was not harmless when evidence of defendant's guilt was not overwhelming).  Additionally, even the presence of some corroborating evidence will not militate against a finding of harmful error when the case essentially turns on credibility. Underwood, 142 Hawai'i at 328–29, 418 P.3d at 669–70 ("Although testimony from other witnesses and physical evidence indicated the surrounding circumstances were generally consistent with CW's account of events, only the statements of CW herself directly described the actual acts constituting the two offenses.").

Based on the foregoing reasons and our review of the record as a whole, we are not left with a firm conviction that there is no reasonable possibility the errors might have contributed to Lora's conviction.  Thus, the admission of the challenged testimony was not harmless beyond a reasonable doubt, and the conviction must be vacated.[19]  State v. Nofoa, 135 Hawai'i 220, 229, 349 P.3d 327, 336 (2015).

---

[19]     In light of our ruling as to the challenged testimony, we need not consider whether the alleged misconduct by the DPA during opening statement, closing argument, and rebuttal closing argument may have also contributed to Lora's conviction.  Additionally, we also do not decide whether the officers' testimonies about what they saw on the security video recording was erroneously admitted or whether the cumulative effect of the errors in this case would require that Lora be granted a new trial.

**B.    The Circuit Court Erred by Effectively Excluding All Defendants Convicted of Offenses Involving Violence from Sentencing Under HRS § 706-667.**

HRS § 706-667(1) defines a young adult defendant as a person convicted of a crime who, at the time of the offense, is less than twenty-two years of age.  Additionally, the defendant must not have been previously convicted of a felony as an adult or adjudicated as a juvenile for an offense that would have constituted a felony had the defendant been an adult.  HRS § 706-667(1).  Defendants that meet this definition may be sentenced to a special indeterminate term of imprisonment if the sentencing court "is of the opinion that such special term is adequate for the young adult defendant's correction and rehabilitation and will not jeopardize the protection of the public."  HRS § 706-667(3).  By its plain language, the statute is applicable to any offense except the offenses of murder and attempted murder.  HRS § 706-667[(4)] ("This section shall not apply to the offenses of murder or attempted murder."); see also Int'l Sav. & Loan Ass'n, Ltd. v. Wiig, 82 Hawai'i 197, 201, 921 P.2d 117, 121 (1996) (noting that the inclusion of a specific matter in a statute implies the exclusion of another when the contrast between the matter expressed and the one not mentioned leads to an inference that the latter was not intended to be included within the statute).  It is also well settled that "[u]nder the rule of lenity, [a penal] statute must be strictly

construed against the government and in favor of the accused."
State v. Woodfall, 120 Hawai'i 387, 396, 206 P.3d 841, 850
(2009) (first alteration in original); State v. Kalani, 108
Hawai'i 279, 288, 118 P.3d 1222, 1231 (2005) (quoting State v.
Shimabukuro, 100 Hawai'i 324, 327, 60 P.3d 274, 277 (2002)).

Lora met HRS § 706-667(1)'s definition of a young
adult defendant and was not convicted of murder or attempted
murder. Accordingly, as the circuit court stated, he was
eligible to be sentenced to a special term under HRS § 706-
667(3). The circuit court decided that it would not sentence
Lora under HRS § 706-667 and stated its reasons for doing so on
the record, a course we have long "urged and strongly
recommended" that sentencing courts take. State v. Lau, 73 Haw.
259, 263, 831 P.2d 523, 525 (1992) (noting that although the
sentencing court is not obligated to state its reasons for
imposing sentence, it is firmly recommended that it do so,
particularly when sentencing a young adult defendant).
Specifically, the court stated that it "divide[s] the world into
basically two camps[:] . . . . [t]hose people that are violent,
and those people that aren't." The court thereafter concluded
that it did not believe a special term was appropriate in Lora's
case and denied his request to be sentenced as a young adult
defendant. In its review of this decision, the ICA stated that

37

the "circuit court's division of offenses into 'two camps' based on the use of violence reflects the circuit court's consideration of the 'protection of the public' as required in HRS § 706-667(3)."

However, it is clear from HRS § 706-667's plain language that the statute is applicable to any offense except murder and attempted murder.  HRS § 706-667(2)-[(4)].  The statute does not distinguish between violent and non-violent offenses and, other than the limitation imposed by HRS § 706-667[(4)], the nature of the offense does not restrict the application of the statute.  The relevant considerations set forth in HRS § 706-667(3) are whether a special term will be adequate for the young adult defendant's correction and rehabilitation and whether a special term would jeopardize the protection of the public.  Categorically excluding defendants convicted of a crime involving violence from being sentenced as a young adult would be contrary to the express provisions of the statute and is inconsistent with this court's policy of interpreting such statutes as being inclusive of a more favorable sentencing alternative in the absence of contrary language.[20]  See State v. Casugay-Badiang, 130 Hawai'i 21, 33,

_____

[20]  Although the ICA concluded that the circuit court's categorical division of offenses simply reflected the court's consideration of the "protection of the public," the court's categorical approach precludes an individualized assessment of the risk posed to the protection of the public

(continued . . .)

305 P.3d 437, 449 (2013) ("Therefore, it appears that the legislature did not intend to exclude [young adult sentencing under] HRS § 706-667 as a sentencing alternative to [the offense of methamphetamine trafficking in the second degree]."); State v. Medeiros, 146 Hawaiʻi 1, 3, 454 P.3d 1069, 1071 (2019) ("[T]he legislature intended for the benefits of [a deferred plea under] HRS Chapter 853 to be broadly available to defendants, except where clearly articulated, deliberate exceptions apply."); State v. Sakamoto, 101 Hawaiʻi 409, 414, 70 P.3d 635, 640 (2003) (holding that the court did not exceed its legal authority in granting the defendant's motion for a deferred no contest plea when the statute did not expressly exclude offenses involving "substantial bodily injury").

In this case, it appears the circuit court denied Lora's request for sentencing as a young adult by relying on the nature of the offense as a determinative factor. But categorically excluding defendants convicted of offenses involving violence would exclude numerous offenses that are not excepted from the statute, such as sexual assault offenses involving forcible compulsion, robbery involving force, and assaults resulting in substantial or serious bodily injury. The

---

(. . . continued)

from sentencing a particular defendant to a special term, which is what is required by HRS § 706-667(3).

categorical approach the court used in this case is contrary to the plain language of the statute, which excludes only murder and attempted murder.  Therefore, by deciding whether to sentence Lora as a young adult defendant based on whether or not the offense involved violence, the court disregarded a principle of law or practice to the substantial detriment of a party litigant.  See State v. Klie, 116 Hawai'i 519, 525-26, 174 P.3d 358, 364-65 (2007) (holding that the district court disregarded rules or principles of law or practice to the substantial detriment of the defendant by denying defendant's motion for a deferred acceptance of no contest based on erroneous statutory interpretation).

We need not decide, however, whether the circuit court abused its discretion in not sentencing Lora as a young adult defendant because the errors we have already discussed require that the conviction be vacated.  See supra Part IV.A.  We consider the issue only because we find it necessary to correct the ICA's interpretation of HRS § 706-667 and to provide guidance if the issue should arise again on remand.[21]  See Omori

---

[21]     The dissent maintains that the circuit court did not rely on the violent nature of the offense in concluding that Lora would not be sentenced as a young adult under HRS § 706-667 because the court made other statements related to the circumstances of the case at the sentencing hearing.  Dissent at 8-9.  The court's recitation of other matters that were germane to this case at the sentencing hearing does not alter the fact that, in considering whether to sentence Lora as young adult, the court explained that it divided the world into camps: those who are violent, and those who are not.  Further,

(continued . . .)

v. Jowa Hawai'i Co., 91 Hawai'i 146, 981 P.2d 703 (1999)

(certiorari granted for the sole purpose of clarifying the ICA's

interpretation of a statute); see also Sentinel Ins. Co. v.

First Ins. Co. of Hawai'i, 76 Hawai'i 277, 297, 875 P.2d 894, 914

(1994) ("We now address issues that we anticipate will arise on

remand[.]").

### V. CONCLUSION

Accordingly, the ICA's October 2, 2019 Judgment on

Appeal and the circuit court's June 12, 2018 Judgment of

Conviction and Sentence are vacated, and this case is remanded

for further proceedings consistent with this opinion.

| | |
|---|---|
| Kevin A. Lora, pro se, on the application, Emmanuel V. Tipon on the brief for petitioner | /s/ Sabrina S. McKenna |
| | /s/ Richard W. Pollack |
| | /s/ Michael D. Wilson |
| Stephen K. Tsushima for respondent | |



---

(. . . continued)

the court's statements that did not relate to the violent nature of the alleged crime concerned mitigating factors such as Lora's military service and family ties.  The reference to such factors underscores that the court's determination as to the applicability of HRS § 706-667 turned on its categorization of the offense.  The ICA's express approval of a "division of offenses into 'two camps' based on the use of violence" is plainly inconsistent with HRS § 706-667.  (Emphasis added.)